Jose SANTELLAŇ, Sr., Appellant,

v.

The STATE of Texas, Appellee.

No. 72130.

Court of Criminal Appeals of Texas, En Banc.

Jan. 29, 1997.

158

Donald H. Greer, Kerrville, for appellant.

E. Bruce Curry, District Attorney, Kerrville, Matthew Paul, State's Atty., Austin, for State.

### *OPINION*

OVERSTREET, Judge.

Appellant was indicted for the offense of murder committed in the course of attempting to commit kidnapping pursuant to V.T.C.A. Penal Code Section 19.03(a)(2), alleged to have been committed on or about August 22, 1993 in Gillespie County. Appellant was convicted in a trial by jury of capital murder on March 8, 1995. The jury affirmatively answered the special issue set forth in Art. 37.071 § 2(b)(1), V.A.C.C.P. and negatively answered the special issue set forth in Article 37.071 § 2(e).[1] The trial court sentenced appellant to death as required by Article 37.071 § 2(g). Direct appeal to this

---

1. Any reference to articles will be to those in the Texas Code of Criminal Procedure in effect at the time of the offense unless otherwise indicated.

Court is automatic. Article 37.071 § 2(h). Appellant raises nine points of error on appeal.

## SUFFICIENCY OF EVIDENCE OF ATTEMPTED KIDNAPPING

In points of error one and two appellant challenges the legal and factual sufficiency of the evidence supporting his conviction He argues a rational trier of fact could not have found the elements of attempted kidnapping beyond a reasonable doubt.[2] We direct our legal and factual sufficiency analyses to this issue.

### Legal Sufficiency

In reviewing legal sufficiency, we view the evidence in the light most favorable to the verdict, and ask whether any rational trier of fact could have found beyond a reasonable doubt all of the elements of the offense. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Barnes v. State,* 876 S.W.2d 316, 322 (Tex. Crim.App.1994), *cert. denied,* 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).

Viewed in the light most favorable to the verdict, evidence introduced at trial established the following: [3]

Appellant had returned to Texas from Michigan in order to be with the victim, his girlfriend. The couple had a "big fight" in July of 1993. On August 19, 1993, appellant told the victim he wanted to make a fresh start. However, on the same day, he wrote a letter to his family (discovered by police after the murder) requesting forgiveness for the

contemplated killing of the victim.[4] In pertinent part, it states:

> [I]t really hurted me when me & [victim] split up. I told myself when she left, that if she were ever to returned, I would kill her. So if your reading this (I did) she shouldn't have came back.[5]

In the letter appellant also referred to an agreement he believed he had with the victim:

> When me & her first got together we told ourselves, this was our last relationship. If we were to part it would have to be death. Forgive me but I still loved her.

The victim also apparently anticipated violence might occur. Shortly before the incident, she wrote a letter to her employer, Hill Country Memorial Hospital, stating that she was resigning and moving to the Brenham area due to a "domestic problem endangering my welfare and possibly the welfare of my two children."

On August 22, 1993, at around 3:10 PM, after "clocking out" from work at the hospital, the victim and Norma Hoffman, a co-worker, walked out into the hospital parking lot. The two women walked together for a short distance chatting, then each headed toward her respective vehicle. As they parted, Hoffman noticed appellant walking toward the victim.[6] The victim veered from her previous course and walked away from her vehicle with appellant, while Hoffman continued on toward her vehicle.[7] Appellant averred in his confession that he had come to meet the victim to "say goodbye," since he was planning to move to Alvin, Texas.

---

2. Appellant does not challenge the jury's finding that he murdered the victim.

3. Inconsistencies, anomalies, and points supportive of appellant's perspective are included as footnotes. We will further discuss this evidence in our sections addressing appellant's factual sufficiency challenge.

4. The police also found a receipt for ammunition when they located the notebook containing this letter in appellant's room at his mother's home.

5. Grammatical errors quoted herein were present in the original.

6. Hoffman later observed that appellant might have emerged from behind some dumpsters or a

wall located at that end of the parking lot. Upon questioning at trial, she said that she did not notice appellant carrying any weapon or other item.

7. Although she could hear that appellant and the victim were having a conversation with each other, Hoffman could not hear what they were saying. She could not discern whether they were arguing or merely having a calm conversation. She heard no shouts or exclamations. The last time she saw the victim standing, appellant was about five feet away from her—not touching her.

As appellant talked with the victim, he felt that she was becoming "abusive," and "[a]ll the hurt came back along with anger." Appellant's "mind went blank." He confessed that:

I pulled out a handgun with a full clip. It went off a couple of times the first time, then she went down. She was sitting up and I was trying to talk to her.... [The victim] was on the ground trying to talk to me, saying we could work it out.

Hoffman suddenly heard the victim screaming, "Think of my kids!" and looked up to see the victim lying on the ground while appellant stood over her pointing a gun at her. They had moved to a location about ten to twenty feet from the spot where the victim had turned and walked with appellant. Hoffman heard two shots, which she described as "pops," and saw appellant shake the gun as if to dislodge a jam.[8] The victim did not say anything else or show any movement. Appellant continued to stand over the victim, pointing the gun at her. Hoffman drove away to seek help. Appellant then left to retrieve his car.

In the meantime, the second eyewitness, Guadalupe Noriega, a housekeeper at the hospital, emerged from the building into the parking lot. She saw the victim lying motionless on the ground and returned inside to seek help. When she came back outside, she saw a car parked next to the victim and a man was lifting the victim into the passenger seat of the car. His clothes were "full of blood." Appellant loaded the victim into his car and took her backpack. At this point, he thought the victim might still be alive. He confessed that, "I just wanted to get away and be with her and spend some time together."

Appellant described the events that followed in his confession:

I traveled till my heart told me to stop and this must have been Campwood.... I went to the motel and got a room....

During this whole time [the victim] was in the front seat of my car.... I took [the victim] in the room and took off her uniform because it was bloody. I cleaned her up with a towel. I drank the twelve-pack of beer and took some pills that [the victim] had.... I felt that [the victim] was right there with me. We laid together and held each other like we used to. I physically expressed my love to her through intercourse probably all night long. I wanted to show her how much I really loved her. Through the night I had vaginal, anal and oral sex with [the victim].... I dressed her in my blue underwear, which was something we could share together because I put the same kind on myself.

Law enforcement officers apprehended appellant on August 24, 1993, at around 2:35 AM at a motel room in Camp Wood, Texas. After speaking with the police for about two hours through the closed motel room door, appellant placed his gun, a Lorcin .25 semiautomatic, outside the door and surrendered peacefully. In the motel room, police found the victim's body lying on the bed, covered with a blanket and dressed in a bra and appellant's blue underwear. Officers smelled a stench in the room indicating that the victim's body had begun to decompose. A clip and a live round for appellant's gun rested against her leg. They also found the victim's backpack, bloody clothing, and other belongings, an empty prescription bottle belonging to the victim, numerous empty beer cans, and a notebook containing more letters written by appellant to his family. In these letters, appellant again asked for forgiveness for the murder of the victim.[9] He discussed in detail his wishes for the disposition of his own body and possessions, as though he expected to be dead when the letters were found. He also included a statement to the police: "[t]o the cops I was not drunk or using drugs when I did this." After officers read him his *Miranda* rights, appellant vol-

---

8. Hoffman admitted that it was possible that more shots might have been fired before the victim's screaming caught her attention. Testimony at trial indicated that appellant may have cleared the jam and then shot the victim again. Appellant suspected that the last shot might have killed the victim.

9. In this notebook, appellant repeatedly refers to a pact he believed he had with the victim: "Sorry, one hundred times, we made a pack so, now we're ending it."

untarily gave a full confession, in which he admitted shooting the victim, and having sexual intercourse with her body. He also confessed to other offenses, including an armed robbery and an incident where he tried to strangle another girlfriend in 1986 or 1987.

The medical examiner testified that the victim had been shot four times, including shots to the right side of the head, the left upper chest, the left abdomen, and the right shoulder. The shot to the head was the immediate cause of death. He testified that this injury would cause brain death almost immediately, although the victim's heart might beat for three to five more minutes. He also testified that semen was found in the victim's vagina and rectal area. Although no semen was found in the victim's mouth, blood was present, and semen in this area could have easily been washed away at some point before the autopsy was conducted.

■■■ Under Texas law, the State carried the burden of proving beyond a reasonable doubt that appellant had the specific intent to commit kidnapping, and that appellant committed an act amounting to more than mere preparation for kidnapping the victim.[10] In order to support a conviction for capital murder, the State is required to prove that appellant developed the requisite specific intent for attempted kidnapping at the time of the victim's death or before that point. *See, e.g., Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim.App.1995); and *Garrett v. State*, 851 S.W.2d 853, 856–857 (Tex.Crim.App.1993). Appellant contends the State did not meet its burden of proving beyond a reasonable doubt that appellant intentionally murdered the victim, *while in the course of attempting to kidnap her*. His arguments can be summarized as follows: (1) appellant did not commit an act amounting to more than mere preparation for kidnapping prior to the victim's death; (2) any act amounting to more than mere preparation committed by appellant after the victim died was irrelevant, because

appellant could not kidnap a corpse; and (3) appellant did not develop the specific intent to kidnap the victim prior to or concurrent with the victim's death.

We address appellant's first two arguments together. Appellant asserts that "a dead body cannot be kidnapped." *See Gribble v. State*, 808 S.W.2d 65, 72 n. 16 (Tex. Crim.App.1990) (plurality opinion) *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991) ("We accept for purposes of analysis that a dead body cannot be kidnapped"). According to appellant, since the medical examiner's testimony indicated the victim was probably rendered brain dead by one of appellant's shots in the parking lot, appellant's act of putting her in the car and transporting her to the motel could not have been an act amounting to more than mere preparation for kidnapping. Appellant recognizes the State focused on his diversion of the victim from her path to her vehicle and the intervening events *before* her death as the acts amounting to more than mere preparation. He counters that the diversion across the parking lot was of insignificant distance and duration to constitute kidnapping.

■■■ Texas law defines "kidnapping" as the intentional or knowing abduction of another person. V.T.C.A. Penal Code § 20.03. "Abduct" means to restrain a person with the intent to prevent his liberation by either (1) secreting or holding him in a place where he is not likely to be found, or (2) using or threatening to use deadly force. V.T.C.A. Penal Code § 20.01(2); *Mason v. State*, 905 S.W.2d 570, 574–575 (Tex.Crim.App.1995).[11] We have held that a kidnapping becomes a completed offense when (1) a restraint is accomplished, and (2) there is evidence that the actor had the specific intent to prevent liberation by secretion or the use or threatened use of deadly force. *Id.* at 575; *Brimage v. State*, 918 S.W.2d 466, 475–476 (Tex. Crim.App.1994). Under the law of criminal

---

10. A person commits "criminal attempt" if, "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." V.T.C.A. Penal Code § 15.01(a).

11. The elements of secretion and use of deadly force are part of the mens rea of kidnapping, not the actus reus. *Mason*, 905 S.W.2d at 575; *Brimage v. State*, 918 S.W.2d 466, 475–476 (Tex. Crim.App.1996).

attempt, the State is required to show that the defendant committed an act amounting to more than mere preparation for committing the offense, in addition to showing that the defendant had the specific intent to commit the offense. *See* V.T.C.A. Penal Code § 15.01(a). Thus, in this instance, the criminal act element of the attempted offense entailed proof beyond a reasonable doubt that appellant committed an act amounting to more than mere preparation for the restraint of the victim.

▮ First, we note that appellant's own confession provided evidence from which a jury could have reasonably concluded that the victim was still alive when appellant lifted her into his car and drove away. Appellant confessed his belief that the victim "may have still been alive" at this time. Further, the medical examiner's testimony did not provide unequivocal evidence that the victim was dead at this time; he admitted that her heart might still beat for three to five minutes after the bullet hit her head and he testified that her other injuries would not cause immediate death. Given the reasonable inference that the victim was alive when appellant placed her in the car, but died soon after this point, we must address whether this act of placing the victim's unconscious body in the car and driving away constitutes a sufficient act of restraint to amount to more than mere preparation for kidnapping under our recent cases. "Restrain" means to restrict a person's movements without consent, "so as to interfere substantially with his liberty, by moving him from one place to another, or by confining him." V.T.C.A. Penal Code § 20.01(1). Restraint is accomplished without the victim's consent, if deadly force, intimidation, or deception is used. *Id.*; *see also Earhart v. State*, 823 S.W.2d 607, 618 (Tex.Crim.App.1991), *vacated and remanded on other grounds*, 509 U.S. 917, 113 S.Ct. 3026, 125 L.Ed.2d 715 (1993) (only requirement for restraint is that the interference with liberty be substantial). The assailant need not have restrained the victim for any certain period of time. *Sanders v. State*, 605 S.W.2d 612, 614 (Tex.Crim.App.1980). Further, the law of criminal attempt does not require that every act short of actual commission of the offense be accomplished. *Gib-*

*bons v. State*, 634 S.W.2d 700, 706 (Tex.Crim. App.1982). We conclude that appellant's act of loading the victim into the car and driving away with her was a sufficient act of restraint to amount to more than mere preparation. *See, e.g., Brimage*, 918 S.W.2d at 476; *Mason*, 905 S.W.2d at 575; *Boyle v. State*, 820 S.W.2d 122, 138 (Tex.Crim.App. 1989), *cert. denied*, 503 U.S. 921, 112 S.Ct. 1297, 117 L.Ed.2d 520 (1992) (restraint occurred where victim voluntarily accompanied defendant in his truck and was bound, gagged, and killed); *Goodwin v. State*, 799 S.W.2d 719, 740 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2913, 115 L.Ed.2d 1076 (1991) (restraint held when victim was removed in car at gunpoint to another location, then immediately killed).

We now address appellant's allegation that he did not have the specific intent to kidnap the victim either at or before the point of the murder. He argues that his written notes and letters and his conduct on the day of the event show clearly that he only intended to murder the victim, and had abandoned any inferred attempt to kidnap her. He points out that his notes made on August 19, 1993, indicate that he had intended to murder the victim pursuant to some type of pact:

> When me & her first got together we told ourselves, this was our last relationship. If we were to part it would have to be death.

He referred to this alleged agreement with the victim again in the letters found in the motel room after the murder: "It was something that me and [the victim] talk about when we first got involved. Case close."

▮ Appellant's expression of murderous intent made three days before the killing, and his later attempt to justify his crimes, do not necessarily preclude the existence of a specific intent to kidnap the victim and possibly have sexual relations with her, which was not expressed in Appellant's first letter to his family or which he developed after the letter was written. The jury could have interpreted some of appellant's comments in his confession, such as his statement that he came to "say goodbye" to the victim on the day of the murder and his desire to "get away and

be with her and spend some time together," as evidence that he had intended to do something other than simply kill her. Further, the jury could have interpreted appellant's sexual abuse of the victim's corpse and related comments in his confession, such as, "I wanted to show her how much I really loved her," as evidence that he had developed the intent to abduct the victim and have sexual relations with her—perhaps intending to kill her later.

In addition, appellant seemed confused at some points regarding whether the victim was still alive. For instance, he stated in his confession that, after he shot the victim and loaded her into the car, "she may have still been alive." He also expounded,

> I felt that [the victim] was right there with me. We laid together and held each other like we used to.

At the point when appellant placed the victim in his car, the medical examiner's testimony indicated that she was probably brain dead, but left open the possibility that her heart was still beating. In sum, sufficient evidence was presented upon which a rational juror could have concluded that appellant had developed the intent to kidnap the victim before or at the time of her death. *See Barnes,* 876 S.W.2d at 321. We hold the evidence is legally sufficient to support appellant's conviction for capital murder. **Appellant's point of error number one is overruled.**

### *Factual Sufficiency*

We have acknowledged that this Court has the authority to review a case upon the facts as well as the law. *Clewis v. State,* 922 S.W.2d 126, 131–132 (Tex.Crim. App.1996); *Bigby v. State,* 892 S.W.2d 864, 874 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995). We articulated the proper standard for such a factual sufficiency review in *Clewis:*

> [The court of appeals] views all the evidence without the prism of 'in the light most favorable to the prosecution.' ... [and] set[s] aside the verdict only if it is so

contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

*Clewis,* 922 S.W.2d at 129, citing *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, *pet. ref'd* ). We have previously extended this standard to the factual sufficiency review of the elements of the offense in capital cases. *Jones v. State,* —— S.W.2d ——, ——, 1996 WL 732038 (Tex.Cr.App. No. 72,026, delivered December 18, 1996, slip op. at 4.)

The factual sufficiency review process begins with the assumption that the evidence is legally sufficient under the *Jackson* test. *Clewis,* 922 S.W.2d at 134. The appellate court then considers *all* of the evidence in the record related to appellant's sufficiency challenge, not just the evidence which supports the verdict. The appellate court reviews the evidence weighed by the jury which tends to prove the existence of the elemental fact in dispute, and compares it to the evidence which tends to disprove that fact. *See, e.g., Ellis County State Bank v. Keever,* 915 S.W.2d 478, 479 (Tex.1995); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994). The court is authorized to disagree with the jury's determination, even if probative evidence exists which supports the verdict. *Clewis,* 922 S.W.2d at 133; *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (Tex.1951).[12]

However, factual sufficiency review must be appropriately deferential so as to avoid the appellate court's substituting its own judgment for that of the fact finder. *Clewis,* 922 S.W.2d at 133. The court's evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony. *See, e.g., Pool v. Ford Motor Company,* 715 S.W.2d 629, 635 (Tex.1986); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951); *In Re Thoma,* 873 S.W.2d 477, 485 (Tex.Rev. Trib.1994). The appellate court maintains this deference to the jury's findings, by finding fault only when "the verdict is against the *great* weight of the evidence presented at

---

12. We note that the Texas Supreme Court's holdings in civil cases such as *In Re King's Estate, supra,* are useful in explaining the proper procedures to follow in conducting factual sufficiency analysis.

trial so as to be *clearly wrong and unjust."* *Clewis,* 922 S.W.2d at 135. (Emphasis in original.) Examples of such a wrong and unjust verdict include instances in which the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Clewis,* 922 S.W.2d at 135, *citing Meraz v. State,* 785 S.W.2d 146, 149 (Tex. Crim.App.1990). We explained this limitation on factual sufficiency analysis in *Clewis:*

> Appellate courts should only exercise their fact jurisdiction to prevent a manifestly unjust result; ... those courts 'are not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable.'

*Clewis,* 922 S.W.2d at 135, *quoting Pool v. Ford Motor Company,* 715 S.W.2d 629, 634 (Tex.1986). Even if the reviewing court does discover that the verdict is against the great weight of the evidence and will return a manifestly unjust result, the court may not render or substitute its judgment for that of the jury. Its only option is to vacate the conviction and remand the case for a new trial.[13] *Clewis,* 922 S.W.2d at 133–135.

█ In the instant case, appellant only disputes the attempted kidnapping aspect of his conviction for capital murder.[14] Having found the evidence legally sufficient under the *Jackson* test, we now proceed to a review of the evidence considered by the jury both supporting and opposing the verdict. *See Id.* at 134. Our review of the record reveals the following facts supporting appellant's arguments that he did not attempt to kidnap the victim, but only intended to kill her:

(1) Appellant had expressed an intent to kill the victim in a letter written three days before the offense;

(2) Some of appellant's comments implied that he believed that he had a "love pact"

with the victim, in which they agreed that their relationship would be their last relationship and that they must die if they ended the relationship;

(3) The victim indicated in her letter of resignation to her employer that she feared for her safety and the safety of her children;

(4) Appellant had acquired a gun and recently purchased ammunition;

(5) Appellant drove to the victim's workplace at the time when she would usually leave work, and may have hidden behind some dumpsters or a wall until the victim emerged from the building;

(6) When the victim's coworker, Hoffman, saw appellant approach the victim, she did not notice him brandishing a weapon or otherwise exerting deadly force to compel the victim to accompany him;

(7) The victim was last seen standing about five feet away from appellant in the parking lot and appellant was not touching the victim;

(8) Hoffman, the only witness to the shooting, heard no argument or evidence of a quarrel or struggle between appellant and the victim until she heard the victim scream "Think of my children," and saw appellant standing over the prostrated victim firing his gun at her;

(9) Prior to the shooting, appellant and the victim had moved to a location only ten to twenty feet from where the victim was last seen;

(10) Evidence indicates appellant shot the victim multiple times, and may have cleared a jam in his gun and then shot the victim again;

(11) Appellant thought his last shot may have killed the victim;

**13.** Were the case to be reversed under the *Jackson* review process, the appellate court would be required to render a judgment of acquittal; the theory being that a determination that the evidence is legally insufficient indicates that the case never should have been submitted to the jury. *Clewis,* 922 S.W.2d at 132–133.

**14.** In his discussion of point of error number two, appellant questions the factual sufficiency of "the verdict." He does not make clear in his

argument whether he is challenging the jury's finding of guilt, or, additionally, the punishment portion of his trial. Since appellant makes his factual sufficiency argument in conjunction with his challenge to the legal sufficiency of the jury's finding of attempted kidnapping in its guilt/innocence verdict, we will consider his factual sufficiency challenge to be brought on the same grounds.

(12) Appellant lifted the victim's body into the passenger seat of his car and transported the victim to a motel in Camp Wood, *after* he fired the shots which he thought may have killed the victim;

(13) Although appellant performed sexual acts on the victim's body, he recognized in the letters he wrote in the motel room that he had killed the victim and asked for forgiveness from his family for this act; and

(14) Four bullets were recovered from the victim's body, and the medical examiner testified that the gunshot to the head caused immediate brain death and unconsciousness.

We also note the following facts in support of the jury's findings that appellant did commit attempted kidnapping: [15]

(1) In his confession, appellant averred that he went to talk to the victim on the day of the killing to "say goodbye" to her because he was planning to move to Alvin, Texas, and he did not express any intent at that time to murder the victim;

(2) Circumstances indicate appellant most likely had possession of the gun when he approached the victim in the parking lot, regardless of whether Hoffman saw the weapon;

(3) The victim's letter to her employer indicates that she feared for her safety, and may have felt threatened or intimidated by appellant when he walked up to her in the parking lot;

(4) Appellant's approach caused the victim to divert her course across the parking lot in a direction opposite her original path to her vehicle;

(5) Appellant stated that he first attempted to speak with the victim (not to kill her immediately), and he began shooting her only after she "became abusive," and his "mind went blank;"

(6) Appellant stopped shooting at one point and tried to talk to the victim and/or she tried to talk to him, while he was pointing the gun at her;

(7) Although the medical examiner testified that the shot to the head would probably have caused instant brain death, he admitted that the victim's heart might continue to beat for three to five minutes;

(8) As appellant lifted the victim into his car, he thought the victim might still be alive;

(9) Appellant took the victim to a motel, cleaned her body, dressed her in his own blue underwear, and made love to her as though she were still alive; and

(10) Appellant made several comments in his confession, which may have been indicative of an intent to kidnap the victim and have sexual relations with her: "I just wanted to get away and be with her and spend some time together," "I wanted to show her how much I really loved her," and "I felt that [the victim] was right there with me. We laid together and held each other like we used to."

Although appellant presents probative evidence showing that he did not attempt to kidnap the victim prior to her death, and intended only to kill her, there exists other probative evidence indicating that appellant may have intended to kidnap the victim, possibly for the purpose of having sexual relations with her. We must accord due deference to the jury regarding the weight and credibility given to witness testimony. *Clewis,* 922 S.W.2d at 133. We see no reason to conclude that the jury's verdict is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Id.* at 135. In looking at all the evidence, it appears that appellant had the intent to kidnap prior to approaching the victim in the parking lot or, in the alternative, formed the intent to kidnap the victim after approaching her in the parking lot. Thus, after reviewing the record, we conclude the jury's finding that an attempted kidnapping occurred is not so contrary to the

15. As explained, *supra,* in order to prove the elevating offense of attempted kidnapping the State carried the burden of proving beyond a reasonable doubt (1) that appellant had the specific intent to commit kidnapping at the time of the victim's death or before that point, and (2) that appellant committed an act amounting to more than mere preparation for kidnapping the victim; i.e., an act amounting to more than mere preparation for the restraint of the victim. *See* V.T.C.A. Penal Code §§ 15.01(a), 20.01, 20.03; *see also Mason* and *Alvarado, supra.*

*overwhelming* weight of the evidence as to be *clearly wrong and unjust. Id.* at 129. **Appellant's second point of error is overruled.**

## ADMISSION OF EVIDENCE OF ABUSE OF CORPSE

In points of error three, four, and five, appellant claims the trial court abused its discretion in admitting evidence which indicated that he had vaginal, anal, and possibly oral sexual relations with the victim's corpse in violation of V.T.C.A Penal Code § 42.10, "Abuse of Corpse." [16] At trial he based his objection on relevancy grounds and alleged violations of Texas Rules of Criminal Evidence 403 and 404.[17]

Appellant moved before trial to exclude evidence contained in his confession regarding four extraneous offenses on the basis of Texas Rules of Criminal Evidence 404 and 403. At a pretrial hearing, the trial judge excluded the parts of appellant's confession which contained certain extraneous offenses, including aggravated robbery, aggravated assault with a deadly weapon, and assault. However, the trial judge refused to exclude evidence of appellant's sexual conduct with the victim's corpse, because it was "dealing with the body of the victim ... part and parcel of the alleged offense." Appellant made a further request that the trial court perform the Rule 403 balancing test, and balance the probative value of the evidence against the danger of unfair prejudice. The trial judge declared that he had performed the balancing test and overruled appellant's motion.

### Relevance—Same Transaction Contextual Evidence

■ Since appellant does not dispute his commission of the extraneous offense of abuse of corpse, we can move directly to review its relevance.[18] *Rachal v. State,* 917 S.W.2d 799, 807 (Tex.Crim.App.1996). In reviewing relevance, we examine every case on its own facts to determine whether the extraneous transaction is relevant. *Id.* Although appellant did not clearly articulate an objection on relevancy grounds at trial, we have held that a Rule 404(b) objection entails a relevancy analysis. *Rankin v. State,* —— S.W.2d ——, ——, 1996 WL 165014, No. 0374–94, slip op. at —— (Tex.Crim.App. delivered April 10, 1996, *reh'g pending* ).

■ The trial judge's comment that the abuse of corpse evidence was "part and parcel of the alleged offense," appears to allude to our case law on the admissibility of evidence of offenses committed in the same transactional context as the indicted offense.[19] We have construed V.T.C.A. Texas Penal Code § 19.03(a)(2) [20] to include conduct

---

**16.** V.T.C.A. Penal Code § 42.10, "Abuse of Corpse," reads:

> (a) A person commits an offense if, not authorized by law, he intentionally or knowingly:
> (1) disinters, disturbs, removes, dissects, in whole or in part, carries away, or *treats in a seriously offensive manner* a human corpse;
> (2) conceals a human corpse knowing it to be illegally disinterred;
> (3) sells or buys a human corpse or in any way traffics in a human corpse; or
> (4) transmits or conveys, or procures to be transmitted or conveyed, a human corpse to a place outside the state.
> (Emphasis added).

**17.** Any further references to rules will be to those in the Texas Rules of Criminal Evidence in effect at the time of the commission of the offense, unless otherwise indicated.

**18.** Texas Rule of Criminal Evidence 401 defines "relevant evidence" as:

> Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**19.** However, we note that, even when the trial judge does not specify his reasons on matters of admissibility of evidence, the decision will be upheld if it is correct on any theory of law. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim. App.1990). Although the trial judge seems to base this decision on our same transactional context cases, the decision also withstands the standard Rule 404(b) extraneous offense analysis (relevancy other than conformity with character) and the Rule 403 inquiry, *infra.*

**20.** V.T.C.A. Penal Code § 19.03(a)(2), "Capital Murder," in effect at the time of the offense read:

> (a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) and:
> (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson.

occurring in an attempt to commit, during the commission of, or in immediate flight after the attempt or commission of the offense. *Drew v. State,* 743 S.W.2d 207, 216 (Tex.Crim.App.1987); *Wooldridge v. State,* 653 S.W.2d 811, 816 (Tex.Crim.App.1983). In *Camacho,* we discussed the admissibility of evidence of other offenses connected to the crime charged. *Camacho v. State,* 864 S.W.2d 524 (Tex.Crim.App.1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). In that case, the defendant went to the house of a man who allegedly owed him money. He then shot one of the homeowner's employees, kidnapped the homeowner's wife and son, and later murdered the wife and son in Oklahoma. *Camacho,* 864 S.W.2d at 527. At his trial for the murder of the employee, the defendant argued that the admission of evidence of the extraneous offenses involving the kidnapping and subsequent murders violated Rule 404(b). The defendant claimed the only purpose of admitting such evidence was to prove that he acted in conformity with his character as a criminal when he murdered the employee. We held:

> [T]he kidnapping evidence is '[s]ame transaction contextual evidence,' .... Such evidence imparts to the trier of fact information essential to understanding the context and circumstances of events which, although legally separate offenses, are blended or interwoven.... As such, it is admissible, not for the purpose of showing character conformity, but to illuminate the nature of the crime alleged.

*Camacho,* 864 S.W.2d at 532. In *Camacho,* the kidnapping and double murder of the homeowner's wife and son were considered to be "part of the same transaction contextual evidence," even though they occurred after the victims were transported to Oklahoma. *Id.*

 In the case at bar, the abuse of corpse incidents occurred in the two days immediately following the offense for which appellant was indicted, and involved the body of the same victim. Appellant's account of his actions with the victim's body after the murder and his statements about these actions give valuable insight into appellant's

motive, plan, and intent in perpetrating the crime. This information was crucial to the State's argument that appellant had the specific intent necessary for attempted kidnapping, and, therefore, for capital murder. Although a legally separate offense, appellant's sexual abuse of the victim's corpse was "blended or interwoven" with the indicted offense, and was "essential to understanding the context and circumstances" of the crime charged. *See Id.* Thus, this evidence was part of the same transaction as the capital murder for which appellant was being tried, and was relevant to the State's proof of the elements of the crime charged.

### Rule 404(b)

Rule 404(b) prohibits the admission of evidence of extraneous offenses committed by the defendant for the purpose of proving the character of the defendant in order to show that he acted in conformity with that character on the occasion in question. The rule also provides exceptions to this principle, when evidence is admitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

 If the opponent of extraneous offense evidence objects on the grounds that the evidence is not relevant, violates Rule 404(b), or constitutes an extraneous offense, the proponent must satisfy the trial court that the extraneous offense evidence has relevance apart from its character conformity value. *Montgomery v. State,* 810 S.W.2d 372, 387 (Tex.Crim.App.1990) (*op. On reh'g*). If the trial court determines the evidence has *no relevance* apart from supporting the conclusion that the defendant acted in conformity with his character, it is absolutely inadmissible. *Id.* On the other hand, extraneous offense evidence is admissible if the proponent persuades the trial court that:

> [the extraneous offense evidence] tends to establish some elemental fact, such as identity or intent; that it tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g. absence of mistake or accident .... [or] that

it is relevant upon a logical inference not anticipated by the rulemakers.

*Montgomery,* 810 S.W.2d at 387–388; *see also Taylor v. State,* 920 S.W.2d 319, 321 (Tex.Crim.App.1996). As long as the trial court's ruling was within the "zone of reasonable disagreement," there is no abuse of discretion and the trial court's ruling will be upheld. *Rachal,* 917 S.W.2d at 807; *Montgomery,* 810 S.W.2d at 391.

 In our discussion of the same transactional context issue, we explained the use of the abuse of corpse evidence to prove appellant's intent to kidnap the victim, an elemental fact in this capital murder case. *See, e.g., Pinkerton v. State,* 660 S.W.2d 58, 61–62 (Tex.Crim.App.1983) (evidence of appellant's abuse of victim's corpse was admitted to show motive and intent). We hold that the trial judge's ruling was within the zone of reasonable disagreement, and the abuse of corpse evidence was properly admitted under Rule 404(b).

### Rule 403

 Once the trial judge has ruled on whether the evidence is relevant beyond its character conformity value, he has ruled on the full extent of the opponent's Rule 404(b) objection. *Montgomery,* 810 S.W.2d at 388. The opponent must then make a further objection based on Rule 403, in order for the trial judge to weigh the probative and prejudicial value of the evidence. *Id.* If the opponent makes the Rule 403 objection, the trial judge must weigh the probativeness of the evidence to see if it is *substantially* outweighed by its potential for *unfair* prejudice, confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. In keeping with the presumption of admissibility of relevant evidence, there is a presumption that relevant evidence is more probative than prejudicial. *Id.* at 389.

As noted above, appellant did make the necessary Rule 403 complaint. Factors which should go into the Rule 403 balancing test include:

(1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;[21]

(2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;

(4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*See Montgomery,* 810 S.W.2d at 389–390.

 We will reverse only upon a clear abuse of discretion. *Ransom v. State,* 920 S.W.2d 288, 299 (Tex.Crim.App.1996); and *Montgomery,* 810 S.W.2d at 392. However, we must do more than decide whether the trial judge did in fact conduct the required balancing between probative and prejudicial values; "the trial court's determination must be reasonable in view of all relevant facts." *Rachal,* 917 S.W.2d at 808; and *Montgomery,* 810 S.W.2d at 392.

 We have determined that the abuse of corpse evidence served to make a fact of consequence (i.e. appellant's specific intent to commit kidnapping) more probable. Further, the evidence presented by the prosecution to show the defendant in fact committed the offense of abuse of corpse was strong: appellant confessed to the abuse of the victim's corpse, and the medical evidence supported his testimony. In addition, appellant does not dispute this fact on appeal. On the other hand, we note the repulsion and horror of the general public toward offenses of this nature, which could potentially affect the jury in an emotional way. Also, a significant amount of time was devoted to this subject at

---

**21.** Proof beyond a reasonable doubt is the standard for the admissibility of extraneous offense evidence. *Harrell v. State,* 884 S.W.2d 154, 160 (Tex.Crim.App.1994). In the immediate case, appellant admitted the commission of the extraneous offense.

trial. However, this evidence was of vital importance to the prosecutor's contention that appellant intended to commit kidnapping on the day of the incident. Although the fact that appellant murdered the victim was not disputed, the issue of whether an attempted kidnapping took place was a key element in appellant's conviction for *capital* murder. In light of these facts, we hold that the trial judge did not abuse his discretion in concluding that the danger of unfair prejudice did not *substantially* outweigh the probative value of this evidence.[22] **We overrule appellant's points of error three, four, and five.**

## INSTRUCTIONS AND QUESTIONING ON PAROLE LAWS

In points of error six, seven, and eight, appellant complains the trial court impermissibly allowed the parties to question potential jurors at voir dire on parole laws relating to a life sentence, and improperly instructed the jury at the punishment phase of trial on these parole laws.[23] Appellant further claims the trial judge abused his discretion in denying appellant's motion for new trial based on these impermissible jury instructions. In particular, appellant asserts that eleven of the thirteen jurors eventually selected were questioned on the subject of the 35 year minimum life sentence in capital cases at voir dire. In addition, the trial judge included the following statement in his charge to the jury:

You are instructed that a prisoner serving a life sentence for the offense of capital murder is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good time, equals thirty-five (35) years. During your deliberations you are not to consider or discuss the possible action of the Board of Pardon and Paroles or the Governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, nor how the parole laws would be applied to this defendant.

Although this instruction does include an admonition that the jurors should not consider the parole laws in their deliberations, the jurors expressed some interest in the issue during their deliberations.[24]

Appellant correctly notes that this Court has held that the parole laws associated with life imprisonment are generally not an appropriate subject for jury consideration in a capital case. *See, e.g., Ford v. State,* 919 S.W.2d 107, 116 (Tex.Crim.App.1996) (parole laws generally not proper issue for jury to consider in a capital case); *Green v. State,* 934 S.W.2d 92, 105 (Tex.Crim.App.1996) (parole not a proper consideration for jury deliberation at punishment stage; trial court permitted to instruct jurors not to consider parole laws); *Smith v. State,* 898 S.W.2d 838, 846 (Tex.Crim.App.1995) (plurality opinion), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995) (parole not proper jury consideration in capital cases even as to

**22.** Appellant complains that the trial judge did not explain his reasoning in conducting the balancing test, and did not require the prosecutor to articulate his reasons for opposing appellant's motion to suppress. When asked whether he had weighed the probative versus prejudicial value of the evidence, the trial judge stated firmly that he had done so. As noted above, even when the trial judge does not specify his reasons, on matters of the admissibility of evidence, the court's decision will be upheld if it is correct under any theory. *Romero,* 800 S.W.2d at 543.

**23.** References to parole laws indicate references to Art. 42.18(8)(b)(2), V.A.C.C.P. effective at the time of the offense.

**24.** The jurors wrote the following note to the trial judge during their deliberations:

We are also having difficulty understanding VII. Some of us were under the understand-

ing that in testimony life imprisonment meant a minimum of 35 years NO MATTER WHAT. Can you clarify that?

The trial court responded:

As to the second part of your question, you must be guided by the court's charge previously given you.

The jury later asked another question about parole laws:

Regarding VII, we are differing in our interpretation of "without consideration of good time." (We are really hung up on this, Judge.) Will good time be considered or will it not be as part of the 35 years?

The trial court made the following response to the second note:

If you sentence the Defendant to Life, the Defendant must serve 35 calendar years before he will receive any consideration of good time or be eligible for parole.

second special issue at punishment phase). However, we stated in *Ford*, "[a]s is permissible, the trial court instructed the jury that the minimum time appellant would serve before being eligible for parole was 35 years." *Ford*, 919 S.W.2d at 116 (emphasis added).

The parole instructions in the recent case of *Cockrell* were similar to appellant's case. *Cockrell v. State*, 933 S.W.2d 73, 90 (Tex. Crim.App.1996); *see also Walbey v. State*, 926 S.W.2d 307, 313–314 (Tex.Crim.App. 1996). In *Cockrell*, the defendant complained that the trial court had erroneously informed the venire that a defendant convicted of capital murder and sentenced to life would serve a mandatory thirty-five year sentence before becoming eligible for parole. *Cockrell*, at 90. The defendant also complained that the trial court should not have instructed the jury on the same subject. However, he conceded he acquiesced to these instructions. *Id.* at 91. This Court held that the defendant had waived any error in the trial court's instructions under the doctrine of invited error, and rejected the defendant's argument that the "statutory and constitutional prohibition" against informing a capital jury about parole laws could not be waived. *Id.*

█ In the case at bar, appellant's counsel took an even larger role in making sure that the information about parole was presented to the jury. Appellant lists fourteen separate instances in which the thirty-five year minimum life sentence without parole rule was mentioned during voir dire questioning. On every occasion except one, defense counsel initiated the discussion of the parole law.[25] Appellant concedes that he did approve the jury charge on parole laws, and he admits that he himself made the motion to voir dire on parole laws. And as noted above, in *Ford*, *supra*, we pointed out that

---

**25.** In the other instance, the discussion of parole laws was initiated by the trial judge.

**26.** Appellant objects to the admission of State's Exhibit numbers 7, 8, 11, 12, 14, 15, 17, 18, 24, 25, 36, 39, 40, 42, 44, 45, 50, and 54.

Appellant objected to numbers 11 and 12 out of the jury's presence and the trial judge overruled his objections, but appellant failed to renew his objection to numbers 11 and 12 when they were offered and admitted before the jury.

including it is permissible in the jury charge instructions thereon..

The trial court did not err in including such instructions and allowing the parties to voir dire veniremembers on such issue. **We overrule points six, seven, and eight.**

### ADMISSION OF PHOTOGRAPHS

In point of error nine, appellant asserts that the trial court's denial of appellant's motion to exclude certain photographs at the guilt/innocence phase of the trial was an abuse of discretion.[26] In particular, appellant argues the prejudicial effect of the pictures outweighed their probative value, and the trial court did not perform the required Rule 403 balancing test regarding these pictures. Also, he contends some of the pictures, especially State's exhibit number 44 (an autopsy photo of the victim with swabs in her mouth) were unnecessarily "gruesome and duplicatious" [sic] of other photographs. He complains on the basis of relevance, in that the offense of murder was not a contested issue at trial and the medical examiner was not even questioned regarding exhibit number 44.

█ We first note that appellant made no objections at trial that the photos were irrelevant because the issue of murder was not contested. Because his argument on appeal does not comport with his objections at trial, we will not address it. Tex.R.App.Proc. 52(a); *Zimmerman v. State*, 860 S.W.2d 89, 99–100 (Tex.Crim.App.1993), *vacated on other grounds* 510 U.S. 938, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993), *reaff'd on other grounds* 881 S.W.2d 360 (Tex.Crim.App.1994).

Appellant's objections at trial were based on Rule 403. He alleged that the prejudicial effect of these photographs substantially outweighed their probative value. He also ob-

---

However, in cases where the trial court, out of the jury's presence, hears and overrules objections to evidence, those objections need not again be made before the jury when the evidence actually is presented. Tex.R.App.Proc. 52(b); *Ethington v. State*, 819 S.W.2d 854, 859 (Tex. Crim.App.1991). Therefore appellant adequately preserved his complaints regarding these photographs for appeal.

jected to several of the photographs on the grounds that they were "cumulative" or "duplicitous"[27] of other photographs, and thus would only serve to prejudice the jury against him and added no probative value. He specifically objected to exhibit number 44 on relevancy grounds, because, he argued, it shows additional blood on the victim's body which could have occurred in transit.

With regard to appellant's challenges, Rule 403 requires an admissible photograph to possess "*some* probative value and that its probative value not be substantially outweighed by its inflammatory nature." *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim.App.1991), *cert. denied*, 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992)(Emphasis in original.). In making this determination, we consider factors including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Id.* The admissibility of photographs over a challenge is within the discretion of the trial judge. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex.Cr.App.1995).

Four of the pictures cited by appellant depict the victim's body when it was first found by police in appellant's motel room.[28] Exhibit numbers 14 and 15 show the bullet wound in the victim's shoulder from different angles. Pictures 17 and 18 show two different views of the victim from the waist up lying in the motel room bed as she was found by the police. Most of her body is covered by a sheet, a large blood stain is visible underneath the body, and the victim is wearing a bra, a watch, and glasses. In one picture, the victim's face is visible. Some blood or lipstick can be seen on the victim's lips. These pictures of the victim at the motel convey the nature of her injuries and

appellant's intent in killing her. The fact that appellant cleaned, dressed and positioned the victim as though she were still alive contribute to the State's argument that appellant was acting out his original intent to kidnap his estranged girlfriend. The victim's body is mostly covered by the sheet and her undergarments and the visible injuries are not particularly gruesome. Although the two pictures of the gunshot wound to the shoulder may be somewhat duplicative, the wound is relatively clean and the pictures are not gory. We find the probative value of these photographs is not substantially outweighed by their danger of unfair prejudice.

State's Exhibits numbers 42, 44, and 45 depict the victim's body during the autopsy. She is naked in all three pictures. Photo number 42 shows the body from the chest up. The gunshot wound to the shoulder is visible as well as a small amount of blood around the mouth and ear and/or bruising to her face. Photo 45 shows the victim's body from the thighs up. Two gunshot wounds are visible and a cut on her face is more apparent. This Court has held that autopsy photographs are admissible unless they depict mutilation of the victim caused by the autopsy itself. *Burdine v. State*, 719 S.W.2d 309, 316 (Tex.Crim. App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). Photos number 42 and 45 show the damage done to the victim's body by appellant. No damage attributable to the autopsy is apparent. Further, appellant had cleaned off most of the blood from the shooting after he transferred the body to the motel room, so the victim is not particularly bloody. These photos are not excessively gruesome, and only depict the damage perpetrated by appellant.

However, picture 44 possesses some additional characteristics. This picture includes the victim's abdomen and head. Two gunshot wounds are visible and her back is slightly arched. Swabs have been placed in

---

**27.** Appellant uses the terms "duplicatious" [sic] in his brief and "duplicitous" in the record. Because he also uses the term "cumulative" and couches his discussion in terms of a violation of Texas Rule of Criminal Evidence 403, we interpret his intended meaning of the former terms to be "duplicative."

**28.** All of the complained-of photos are in color. Most are four by six inches in size, including the pictures of the body in the motel room and the autopsy photos objected to by appellant. The pictures of the bullet wound to the shoulder are close-ups. A few pictures of smaller items were enlarged to eight by ten inches.

the victim's mouth, apparently as part of the autopsy, and a red stain is visible around her mouth and nose. At trial, the medical examiner testified that he was unaware of how blood could have accumulated in the mouth area. He admitted that this accumulation could have occurred when the body was transferred for the autopsy. However, this picture is not excessively gruesome, and the amount of blood visible is slight. After viewing this photograph, we are of the opinion that the changes rendered as part of the autopsy process were of minor significance. The disturbing nature of this picture is primarily due the injuries caused by appellant (i.e., the gunshot wounds, bruises, cuts, and the very fact that the victim is dead). We hold that the probative value of the autopsy pictures was not substantially outweighed by the danger that they unfairly prejudiced appellant.

Appellant does not explain to this Court why he feels that the other photographs mentioned in his brief were unfairly prejudicial.[29] He merely lists these exhibits in a table with a brief phrase describing the content of the photographs. This is not enough information for this Court to adequately address appellant's unarticulated Rule 403 complaints about these pictures. We decline to make appellant's arguments for him. *See* Tex.R.App.Proc. 74(f); *Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Crim. App.1992), *cert. denied*, 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

Appellant also contends the trial judge did not perform the required balancing test when appellant made the Rule 403 objection. We have held:

> When admitting evidence, the trial judge does not *sua sponte* engage in balancing the probative value against the prejudice, but does so only upon sufficient objection invoking Rule 403 by the party opposing admission of the evidence.... 'But once the rule is invoked, the trial judge has no discretion as to whether or not to engage in the balancing process.'

*Long*, 823 S.W.2d at 271, citing *Montgomery, supra*. Appellant did make a Rule 403 objection to these exhibits both outside the presence of the jury and when they were offered in evidence.[30] Thus, the trial court was required to perform the Rule 403 balancing test. *Montgomery*, 810 S.W.2d at 389. Although appellant asserts that the trial court did not perform the balancing test, the trial court did not explicitly refuse to do the test, it simply overruled appellant's Rule 403 objections. We find nothing in the record to indicate that the trial court did not perform a balancing test, albeit a cursory one.

We conclude the probative value of the arrest scene and autopsy photos is not substantially outweighed by the danger of unfair prejudice or the cumulative or misleading nature of the evidence. The trial judge committed no abuse of discretion in refusing to exclude these pictures. **Appellant's point of error nine is overruled.**

After reviewing and overruling all of appellant's points of error, we affirm his conviction and sentence.

---

**29.** Appellant does not articulate his arguments that the trial court abused its discretion in admitting State Exhibits 7, 8, 11, 12, 24, 25, 36, 39, 40, 50, and 54.

**30.** *But see* footnote 29 regarding Exhibits 11 and 12.