# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-07-00049-CR

**Raymond Salazar, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
## NO. D-1-DC-2005-300413, HONORABLE MICHAEL J. MCCORMICK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Raymond Salazar appeals his conviction for indecency with a child by sexual contact. *See* Tex. Penal Code Ann. § 21.01 (West Supp. 2008), § 21.11(a)(1), (2) (West 2003). After appellant's plea of not guilty, the jury found him guilty and assessed his punishment at seven years' imprisonment.

## POINT OF ERROR

Appellant advances one point of error. He challenges the factual sufficiency of the evidence to sustain his conviction for indecency with a child by sexual contact. No challenge is addressed to the legal sufficiency of the evidence to support the conviction. On direct appeal a court must begin its factual sufficiency review with the assumption that the evidence is

legally sufficient under *Jackson*.[1]  *Watson v. State*, 204 S.W.3d 404, 406 (Tex. Crim. App. 2006); *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996); *Key v. State*, 88 S.W.3d 672, 677 (Tex. App.—Tyler 2002, pet. ref'd).

## BACKGROUND

Anna Allen, a director of the "Pebble Project," testified that her organization was established to prevent child abuse.  On April 3, 2000, her group was presenting a program at the Burnet Middle School in Austin involving skits on how to handle a bully, stranger danger, and personal issues (such as sexual abuse).  After the skits, forms were passed out to the students that included a place to check if the student wanted to talk to a volunteer of the "Pebble Project."

R.S., the complainant in this case, was almost twelve years old at the time.  She checked the form handed out and was interviewed at the school by Anna Allen.  In the conversation, R.S. began to "shake and cry" according to Allen.  R.S. revealed to Allen that appellant Salazar was her stepfather, and he had been touching her private parts since she was six or seven years old.  R.S. also reported that on the previous Saturday, April 1, 2000, she was sleeping on the couch in the living room when she awakened to find her shorts pulled down, and she "pushed something away."  R.S. told Allen that she had never told anyone before because "it would ruin everything." Allen filed a report with the Child Protective Services (hereinafter CPS).

Teri Reynolds Freeman, a CPS investigator, testified that she interviewed R.S. at school on April 4, 2000, and met with members of R.S.'s family.  Freeman instituted a "safety

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (1979).

plan" requiring appellant to leave the home, and have no unsupervised contact with the children—R.S., her younger brother, and appellant's own child.

Austin police detective Johnny McMiller contacted R.S.'s mother, Suzanne Salazar, on April 11 and 12, 2000. Mrs. Salazar expressed her concern over the family's financial situation with her husband living elsewhere. Mrs. Salazar informed the officer that R.S. had been recently disciplined over an incident and was angry with appellant, and that if the alleged touching occurred on April 1, 2000,[2] it could not have happened because R.S. spent that night at her grandmother's house. She further told Detective McMiller that R.S. had changed her mind. Detective McMiller felt that Suzanne was "in denial" and concerned that the situation was undermining her marriage to appellant.

On April 17, 2000, R.S. was taken to the Child Advocacy Center in Austin for a videotaped interview. In that interview, R.S. stated that she thought that she only dreamed about the sexual contact. After the interview, Detective McMiller met with an assistant district attorney who declined under the circumstances to prosecute appellant. Teri Freeman conferred with her supervisor, and appellant was allowed to return home. The case was closed.

Over four and a half years later, on November 29, 2006, Jennifer Pena, an investigator with CPS for one year, was assigned a case involving M., R.S.'s then fourteen-year-old brother. This inquiry apparently concerned a physical assault by appellant upon M.[3] During this investigation,

---

[2] Suzanne Salazar later testified that on April 1, 2000, they had a first birthday party at a park for her daughter by appellant. R.S. in her testimony acknowledged that she once told her mother that appellant "focused" on his own daughter and that she felt unloved.

[3] This matter was explored in detail at the penalty stage of the trial.

3

Pena decided to interview R.S. about her earlier allegations in 2000. Pena testified that R.S., now sixteen years old, became nervous but admitted that her earlier allegations were true. R.S. reported that her mother had earlier told her to lie. R.S. later gave a videotaped interview at the Child's Advocacy Center relating her allegations. The case was reopened. An indictment was returned on March 17, 2005. On July 28, 2006, R.S. filed an affidavit of non-prosecution. Nonetheless the trial was conducted on October 16, 17, 18, and 19, 2006.

At trial, the now eighteen-year-old R.S. testified that she was in high school and lived with her mother and the mother's boyfriend, her brother, and her half-sister. She did not know where her own biological father was, that he had "been in and out of jail for not paying child support." She acknowledged that appellant came into her life when she was two or three years old and later married her mother. The "touching" of her private parts began when she was six or seven years old. "It didn't happen often. Just every once in a while." R.S. stated that it occurred about ten times, and stopped after she reported it at school to the Pebble Project when she was almost twelve years old. R.S. did not remember the first touching but related three incidents that she could recall. In one incident, date unknown, R.S. testified that she heard a noise and woke up, and that appellant got into a twin bed with her next to the wall while she faced the other way. R.S. related that appellant put his arm around her and touched the lower area—the private part of her body. The record reflects:

> Q. What do you use that private area for?
>
> A. Sex.
>
> Q. Okay, is it also called a vagina?
>
> A. Yes.

4

R.S. remembered that she was wearing panties and pajamas. She could not recall whether appellant touched her under her clothing or on the outside of such clothing. She stated that he "just rubbed it. There was no inserting." She thought it lasted ten minutes but was not sure.

When reminded, R.S. also recalled another incident, some time closer to her outcry at school. She stated that one night she and her brother were sleeping on different couches in the living room when she suddenly awakened, and found appellant standing right in front of her. She was "shocked," but appellant turned and left the room. When directly asked, R.S. said appellant was actually kneeling at the couch, and when he left, she then found her shorts were unbuttoned.

Upon being reminded again, R.S. told of another incident when she and her brother were playing video games in the living room and her mother was in the kitchen. She described appellant as being "under the covers." She related that she got cold and appellant covered her with blankets and in the process touched her private parts. When asked if she told her mother about these incidents, R.S. stated "sometimes," but she retracted that, and then she denied informing her mother because she would not have believed her.

R.S. testified that after her 2000 outcry at school, her relationship with her mother did not go well. When R.S. insisted that she was being truthful, her mother told her to lie. She knew that her mother had three children and believed her mother did not want to break up the family. R.S. did not want to alienate her mother and stated on the 2000 videotape that she dreamed the sexual contact. Appellant returned to the home and no further incidents occurred. Over the years, R.S. began to regard appellant as a father figure. In November 2004, R.S. became angry about

5

appellant beating her brother, and when asked, she acknowledged that her original accusations were true. At this time, she felt that her mother had more confidence in her to tell the truth about the past incidents.

When asked at trial why she had signed the affidavit of non-prosecution which her mother had obtained from defense counsel, R.S. responded, "it's been two years having CPS, the law, therapy, I just can't take it anymore." R.S. agreed, however, that her accusations were still truthful. When asked if she had been regretting the trial, R.S. replied, "I didn't want my sister to grow up like me without a dad."

Suzanne Salazar, R.S.'s mother, was called by the State as a witness. She testified that she loved her daughter and appellant, her husband, and was shocked and confused when the allegations surfaced in April 2000. She related that R.S. made no outcry to her and would not give her any details of what had occurred. She had inquired of R.S. if it could have been someone else or if R.S. had dreamed something happened, but she had gotten no answers. She had not intended to influence R.S. She acknowledged that she later told Detective McMiller that R.S. had changed her mind. This was before the first videotape was made in which R.S. related a dream sequence. Mrs. Salazar reported that appellant left their home again in November 2004 when the case was re-opened. She was still legally married to appellant because of the high cost of divorce. She, however, did not socialize with him.

Dr. William Carter, of Waco, established his qualifications as an expert in child sexual abuse cases. In essence, Dr. Carter testified that R.S.'s actions including recantation were typical of children who have been victims of sexual abuse.

6

Monica Garcia, appellant's sister, testified for the defense that appellant was a loving and caring father to R.S., R.S.'s brother, and his own daughter. She described appellant coming to her house and crying over R.S.'s allegations. Suzanne Salazar was called as defense witness without any announcement that the defense was seeking further cross-examination. Much of her testimony covered ground already explored. Mrs. Salazar testified that she had to believe "what she [R.S.] says." She also believed appellant who had denied the offense. It was a "50-50" situation with her. When asked if R.S. had previously lied to her, Mrs. Salazar responded, "we're talking about a teenager."

## FACTUAL SUFFICIENCY

The determination of the legal and factual sufficiency of evidence requires implementation of separate and distinct standards. *Lasiter v. State*, 275 S.W.3d 512, 519 (Tex. Crim. App. 2009). "Courts and litigants *should not* combine their legal and factual analysis." *Id.* (emphasis added).

A verdict [judgment] must be supported by factually sufficient evidence as well as legally sufficient evidence. "But unlike a legal sufficiency review, which is a federal due process requirement, a factual sufficiency review is a creature of state law. On direct appeal, a court must begin its factual sufficiency review with the assumption that the evidence is legally sufficient under *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)]." *Id.*

Here, appellant challenges only the factual sufficiency of the evidence to sustain his conviction, so we assume that there is legally sufficient evidence to support his conviction. Evidence that is legally sufficient, however, can be deemed factually insufficient in two ways:

7

(1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, and (2) when the supporting evidence is out weighed by the great weight and preponderance of contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson*, 204 S.W.3d at 414-15.[4]

A court of appeals on direct appeal must consider in a factual sufficiency challenge all of the evidence in a neutral light rather than (as in a legal sufficiency review) in the light most favorable to the verdict or judgment. *Roberts*, 220 S.W.3d at 524; *Watson*, 204 S.W.3d at 414-15. Although an appellate court has the ability to second-guess the jury to a limited degree, the factual-sufficiency review should still be deferential, with a high level of skepticism about the jury's verdict required before a reversal can occur. *Grotti*, 273 S.W.3d at 283; *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); *Watson*, 204 S.W.3d at 417; *Cain v. State*, 958 S.W.2d 407, 410 (Tex. Crim. App. 1997).

In a factual sufficiency analysis, it must be remembered that the jury is the trier of fact and judge of the credibility of witnesses. *See* Tex. Code Crim. Proc. Ann. art. 36.13 (West 2007), art. 38.04 (West 1979); *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). Appellate courts should be on guard not to submit their own judgment in these matters for that of the

---

[4] The "two ways" in which evidence can be factually insufficient is frequently described using the word "verdict," which is correct only if there has been a jury trial. "A 'verdict' is a written declaration by a jury of its decision of the issue submitted to it in the case." Tex. Code Crim. Proc. Ann. art. 37.01 (West 2006). In a non-jury or bench trial, the trial court's decision is referred to as a "judgment."

trier of fact. *See id.* An appellate court is not free to override a verdict simply because it disagrees with it. *Lasiter*, 275 S.W.3d at 518; *Cain*, 958 S.W.2d at 407.

An appellate court must first be able to say, with some objective basis in the record, that the great weight and preponderance of evidence contradicts the jury's verdict before it is justified in exercising its appellate fact jurisdiction to order a new trial. *Grotti*, 273 S.W.3d at 283 (citing *Watson*, 204 S.W.3d at 417). A reversal for factual insufficiency cannot occur when the greater weight and preponderance of evidence actually favors the conviction. *Roberts*, 220 S.W.3d at 524.

Here, appellant does not point to any sharply diverse or even conflicting evidence that undermines the jury's verdict. Appellant called his sister and his wife, R.S.'s mother, as defense witnesses. Their testimony did not present a defense or in effect contradict the State's case. Appellant's factual insufficiency claim must rest primarily upon the State's evidence being so weak that the jury's verdict was clearly wrong and manifestly unjust. Appellant's only attack upon the evidence being factually insufficient is to question the credibility of R.S. The jury knew that R.S.'s first outcry was at school and not to a family member, that her recantation came after appellant left the home and her mother talked to her, that her reassertion of the charges came over four years later when a C.P.S. assault investigation involved appellant and her brother, and that she had signed an affidavit of non-prosecution. Throughout the trial R.S. maintained that she was being truthful about the sexual abuse she had endured. The jury was the judge of the credibility of the witnesses and the weight to be given to their testimony. The jury was free to accept or reject all or any part of a witness's testimony. It is obvious that the jury accepted R.S.'s version of events. Moreover, the

9

uncorroborated testimony of a child victim of a sexual assault is sufficient to sustain a conviction. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (West 2005).

Viewing all of the evidence in a neutral light, we find the jury was rationally justified in finding appellant guilty of sexual assault. The verdict was not clearly wrong or manifestly unjust. *See Watson*, 204 S.W.3d at 417. Appellant's sole point of error is overruled.

The judgment of conviction is affirmed.

 

 

_____

John F. Onion, Jr., Justice

Before Justices Patterson, Pemberton and Onion*

Affirmed

Filed:   September 10, 2009

Do Not Publish

* Before John F. Onion, Jr., Presiding Judge (retired), Texas Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 2005).