TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-95-00475-CR





Trayvonce William Wright, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT


NO. 18,898, HONORABLE CHARLES E. LANCE, JUDGE PRESIDING






 The State prosecuted Timothy Winters, Rashid Muhammad, Trayvonce W. Wright,
and Kenneth Smith for the murder of Wilbert Miller on or about July 27, 1994. (1) The court
instructed the jury to acquit Smith. The jury convicted the remaining defendants and sentenced
Wright to forty years in prison and a $10,000 fine. Wright challenges the sufficiency of the non-accomplice witnesses' testimony and evidence to support the verdict. He also challenges the
admission of some evidence. We will affirm the judgment of conviction.

 The only eyewitness account of the murder came from Chris Evans, a participant. 
Evans testified at trial that Muhammad told him that Miller owed Muhammad $500. Evans said
that on an evening in summer 1994, he and the four defendants took Miller from Kathy Pride's
house in a green Buick LeSabre. They got out of the car and Winters held Miller so that
Muhammad and Wright could stab him. Winters next took a knife and stabbed Miller, then Evans
stabbed Miller. The five left Miller to die.

 Several months later, Evans reported finding a skeleton to police. Investigators
eventually identified the skeleton as Miller's remains. Evans initially denied knowing who the
skeleton was. Over the course of several interrogations, his story evolved, increasing his
culpability, until he admitted to delivering the final, fatal stab wound to Miller.

 Because Evans was an accomplice to the murder, his testimony cannot be the basis
for the conviction of others unless it is corroborated by other evidence tending to connect the
defendant with the offense committed; the corroboration cannot merely show commission of the
offense. See Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979).

 Wright's first point of error, complaining that he was convicted solely on the basis
of uncorroborated accomplice testimony is subsumed into his second and third points of error, by
which he complains that there was factually and legally insufficient evidence to support his
conviction. (2) See Munoz v. State, 853 S.W.2d 558, 560 (Tex. Crim. App. 1993). When
reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable
to the verdict, and ask whether any rational trier of fact could have found beyond a reasonable
doubt all of the elements of the offense. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Santellan
v. State, 939 S.W.2d 155, 160 (Tex. Crim. App. 1997). When reviewing the factual sufficiency
of the evidence, we view all the evidence without the prism of "in the light most favorable to the
prosecution" and set aside the verdict only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust. Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim.
App. 1996). We must ensure our review does not substantially intrude on the jury's role as sole
judge of the credibility of witnesses. Santellan, 939 S.W.2d at 164.

 When reviewing the sufficiency of the corroboration, we must ignore the
accomplice witness's testimony and decide whether the remaining evidence confirms material facts
in the accomplice testimony tending to connect the accused with the crime. Walker v. State, 615
S.W.2d 728, 731-32 (Tex. Crim. App. 1981). We view the corroborating evidence in the light
most favorable to the verdict. Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); Utsey
v. State, 921 S.W.2d 451, 453 (Tex. App.--Texarkana 1996, pet. ref'd). The accomplice witness's
testimony need not be entirely corroborated, nor need the corroboration directly link the accused
to the crime or be sufficient in itself to establish guilt. Gill, 873 S.W.2d at 48. Evidence that
corroborates what the accomplice said he and others did but that does not connect the others to
the crime cannot be considered. Walker, 615 S.W.2d at 732 (finding murder weapon where
accomplice said they threw it does not connect other defendants to crime). Evidence that merely
shows the commission of the offense and the joint presence of the accomplice and accused shortly
before or after the offense does not provide sufficient corroboration. Lyman v. State, 540 S.W.2d
711, 714 (Tex. Crim. App. 1976). Additional evidence can make that evidence sufficient
corroboration, however. Edwards v. State, 427 S.W.2d 629, 633 (Tex. Crim. App. 1968)
(presence shortly before crime with accomplice near crime scene in small town in early morning
hours without explanation, immediate journey to city hundreds of miles south, and pawning of
victim's pistol after crime provided sufficient corroboration).

 Peace officers and scientists testified regarding the discovery of the skeletal remains
and the results of tests involving the remains. The tests showed that the remains were Miller's. 
Fractured ribs and vertebrae were consistent with multiple stab wounds, as were tears in a shirt
found nearby that tests showed likely belonged to the victim. Tests on a knife introduced as a
possible murder weapon showed nothing linking it to the victim or the appellants. Department
of Public Safety crime laboratory chemist Steve Robertson opined that, because the knife in
evidence likely did not make some of the tears in the shirt, a second weapon probably was used
in the murder. Examination of Wright's car revealed no hairs or fibers matching the victim or
his clothing. No physical evidence linked the appellants to the victim.

 Some of Miller's friends and family testified that he was selling drugs. A cousin
found crack and powder cocaine in his room. An uncle testified that he flushed the drugs down
the toilet; the uncle testified that he knew of no connection between the drug sales and the
appellants. Other witnesses testified that they never saw Miller sell drugs.

 Virgil Crawford testified that he sold drugs with Smith and the appellants. 
Crawford said he had last seen the victim with the appellants at Kathy Pride's house and that
Muhammad said that he was going to "fuck [Miller] up if he didn't have the money" for some
drugs that had been advanced to Miller. Crawford said he left the house because he felt something
bad was going to happen. He never saw Miller alive again.

 Pride testified she had seen the appellants with Crawford at her house, but never
all at once. She recalled appellants and the victim being at her house together. She testified that,
if Miller had "crossed" the appellants, she believed they would harm him. She also testified,
however, that the appellants and the victim were on friendly terms the last time she saw them. 
She knew of no connection between the appellants and the murder.

 April Knight, Pride's niece, gave confusing and contradictory statements and
testimony. She gave two written statements to police, the second of which was admitted at trial. 
She testified before the grand jury and at the trial.

 In the admitted second statement, Knight said that in the late summer of 1994, the
appellants, Smith, the victim, and Evans left her aunt's house after dark in Wright's green car. 
Knight never saw Miller again. After an hour, the appellants and Smith returned. The appellants
remained outside talking about killing someone, but acted like they did not want her to hear. 
Smith appeared upset and in shock. Knight said Miller was selling drugs for Muhammad and
Wright, but "got crossways" with them over some dope, probably by not paying them for some
dope that they had fronted him. Sometime later, Smith told her he was present when Miller was
murdered. He did not tell her who did the killing, but said he tried to dissuade them and just
watched.

 At trial, Knight testified that the four defendants sold drugs at Pride's house. She
first testified that she never saw Miller, her cousin, sell drugs; when directed to read her second
statement to police, she recalled seeing Miller sell drugs for Wright. She testified that she knew
of no problem between Miller and the defendants; when directed to read her second statement,
she acknowledged that she had said that there was a problem, but recanted that assertion. She
nevertheless maintained that Miller owed the appellants money for drugs. She then stated that
Miller had sold drugs for four or five years before the appellants ever came to Rockdale, while
admitting that she had only minutes before denied ever seeing him sell drugs. She said that, on
the night Miller disappeared, all four defendants were at the house where she lived with her aunt,
Kathy Pride; she said Miller showed up briefly and left alone, though she had said in her second
statement that he left with the defendants. She said she was scared when she gave the second
statement and simply went along with what the officers told her had occurred. She denied that
Smith told her he was present when Miller was killed, while acknowledging that she had testified
before the grand jury he had done so. 

 At that point, the trial court excused the jury and admonished Knight that she was
committing aggravated perjury, a felony offense for which she could be imprisoned for ten years
and fined $10,000. He noted that her grand jury testimony and her trial testimony conflicted and
could not both be true. He told her he "did not like to have people come in here and take a
solemn oath before God and this Court and then lie. I'm sick of it. . . . I suggest strongly that
you start telling this Court the truth." He then asked her why she had lied. When she said she
did not know, the court replied, "Give me a break," before recessing court.

 When testimony resumed and Knight was confronted with a contradiction between
her trial testimony and her grand jury testimony, Knight deferred to her grand jury testimony that
the appellants visited every weekend. She conformed her testimony about who she saw getting
into a car on the night of the murder to the version in her second statement; she said the
defendants, the victim, and Evans got into the car, but that only the defendants returned. She
again denied that Smith told her about the stabbing but, when confronted with her second
statement to police that he had, she said that he had told her about the stabbing. (The court
limited that testimony about Smith's assertion to use against Smith.) After again giving contrary
testimony on whether he told her he was present when Miller was stabbed, she stated that her
testimony that he had not told her he was present was false.

 On cross examination, Knight said the police threatened to take her baby away from
her if she did not tell the truth in her statements to them; she said she therefore told the police
what they wanted to hear. She denied telling Virgil Crawford that the appellants killed Miller;
she said Crawford might lie. She said she never saw Miller afraid of appellants. She denied
being told or knowing who killed Miller. When asked what the truth was, she said she did not
know. Knight then reasserted her original statement to police that the last time she saw Miller he
was walking alone, and said that in her second statement she only went along with the "official
version" that he got into the car with the appellants. She said she never saw the defendants sell
powdered cocaine; if Miller had some, it was not from them. She said that the defendants were
not in Wright's green car but in a rented car the last time they were in Rockdale. She said that
the second statement was the police's words, not hers; she said the second statement was the truth,
but that she merely went by what they told her, not what she knew.

 On redirect examination, Knight said the second statement was not the truth, that
she never saw the defendants and Miller get into the car, and that Smith told her nothing. She
admitted that some of her grand jury testimony was false. She said she could not remember when
she last saw Miller. Though she testified that the appellants did not come to Rockdale during June
or July, she admitted she was not in Rockdale then and would not know if they had. On recross
examination, however, she said she visited on weekends. She said that the police kept insisting
that she tell the truth, when the truth was that she did not know anything about the murder.

 At the close of her redirect examination, the State offered Knight's second
statement to police in evidence. It was admitted without objection or limitation. The instruction
in the jury charge, limiting the consideration of evidence "that was admitted solely against
Kenneth Smith" to use only against Kenneth Smith, does not limit the use of evidence admitted
without limitation. On contemporaneous request, the court limited a particular part of Knight's
testimony about what Smith told her, but that limitation did not apply to the typed statement that
was later admitted without objection or limitation. (3) 

 Viewed most favorably to the verdict, the evidence is legally sufficient to support
the conviction. Evans's testimony is easily sufficient if corroborated. Crawford's testimony
provides a statement of motive and intent to kill by Muhammad that immediately precedes Miller's
disappearance. The destruction of the drugs by Miller's relatives further corroborates Evans's
testimony regarding the motive for the slaying. Knight's testimony and statement, viewed most
favorably to the verdict, show appellants with the victim shortly before the murder, their
motivation to kill him, their discussion of murder after their return without Miller, and Miller's
coincidental disappearance. Her relation of Smith's admissions is somewhat corroborative, but
not decisive because he did not tell her who did the killing; it does, however, place all appellants
at the murder scene. The corroboration allows us to consider Evans's testimony, which provides
legally sufficient evidence for every element in the murder charge.

 The evidence is also factually sufficient to support the conviction. While Knight's
vacillation gives us some pause, the jury is the sole judge of the credibility of witnesses and can
believe or disbelieve all or any part of her testimony. Evans's testimony provides ample evidence
to support the conviction. We cannot say that the verdict was so against the overwhelming weight
of the evidence as to render it clearly wrong and unjust. We overrule points one, two, and three.

 By point of error four, Wright contends that the clearly prejudicial effect of the
State's display of a vial of crack cocaine for demonstrative purposes outweighed any probative
value. The State introduced it through the police chief. Upon admitting it, the trial court gave
the following limiting instruction:


State's Exhibit 18 is admitted into evidence for demonstrative purposes only. 
Again, I caution the jury, this is to be considered only for demonstrative--for
demonstration and get you familiar with what "crack" cocaine looks like and its
typical patching--packaging. It--other than that, it has no relevance in this case
whatsoever and should not be considered against any Defendant to have any other
relevance than for demonstrative purposes only.


The trial court must admit relevant evidence unless the probative value of the evidence is
substantially outweighed by the risk of unfair prejudicial effect or other deleterious effects. Tex.
R. Civ. Evid. 403; Santellan, 939 S.W.2d at 169. We can reverse only if we determine, in view
of all relevant facts, the trial court abused its discretion. Id. 

 The crack had some probative value, although slight. The State showed it to
Miller's cousin, who testified that he found "rocks" among Miller's possessions, and the uncle
to whom the cousin took the "rocks"; both the cousin and uncle said the substance found looked
like State's Exhibit 18. Crawford also recognized it as crack. These demonstrations showed their
familiarity with crack, allowing the State to show that its witnesses who said Miller and the
defendants sold crack knew what crack was. 

 On the other hand, the risk of unfair prejudice was similarly small. There was
repeated evidence that the victim, the defendants, and many of the witnesses were thoroughly
familiar with crack as users, sellers, or both. The State's theory of the case was that the
appellants killed Miller for shorting them on a drug deal. The display of a small amount of crack
did not inject new, damaging proof. It was far from the only indication to the jury that the
defendants were bringing drugs into their town. Jurors who were not already inflamed by hearing
about the prevalence of crack were not likely to be suddenly incensed by viewing crack that
admittedly did not belong to the defendants. In view of the overall development of the case, we
cannot say that the trial court abused its discretion by concluding that the probative value of the
demonstrative evidence was substantially outweighed by the risk of unfair prejudice. We overrule
point four.

 By point of error five, Wright contends that the clothing items found at the crime
scene were improperly introduced as evidence because the State failed to prove the chain of
custody. The rules of evidence require authentication or identification that supports a finding that
the matter in question is what its proponent claims. Tex. R. Crim. Evid. 901(a). A chain of
custody is not required if the item possesses characteristics which are fairly distinctive and readily
identifiable, and if the substance of which the item is composed is relatively impervious to change. 
 Ramirez v. State, 658 S.W.2d 808, 812 (Tex. App.--Corpus Christi 1983), aff'd, 672 S.W.2d 480
(Tex. Crim. App. 1984); Hammett v. State, 578 S.W.2d 699, 708 (Tex. Crim. App. 1979)
(citing McCormick's Handbook on the Law of Evidence, 527 (2d ed., E. Cleary ed. 1972)). The
clothing items--a bandana, a sweatshirt, a pair of jeans, a belt, and pair of shoes--are fairly
distinctive and readily identifiable. Robertson, the DPS chemist through whom the items were
admitted, recognized and identified each item as that which he and other searchers found at the
crime scene along with the skeleton. The basic materials of the clothing were essentially
impervious to change (Robertson testified multiple slits were in the shirt when it was found in the
field). There was no evidence or intimation of replacement of or tampering with the clothes. The
State presented sufficient evidence to prove that the items offered in evidence were the items found
at the crime scene. Without evidence of tampering, sparse testimony regarding the chain of
custody of the items in the interim goes to the weight given the evidence. Lagrone v. State, 942
S.W.2d 602, 617 (Tex. Crim. App. 1997) (citing Alvarez v. State, 857 S.W.2d 143, 147 (Tex.
App.--Corpus Christi, 1993, pet. ref'd)). We overrule point five.


 We affirm the judgment.



 


 Marilyn Aboussie, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: July 24, 1997

Do Not Publish

1. Winters and Muhammad appeal their respective convictions in Cause Nos. 03-95-00473-CR
and 03-95-00474-CR also decided this date. We will refer to them and Wright collectively as
"appellants." The three appellants were tried together, and we refer to our other two opinions
for a full recitation of the facts and evidence. 
2. Wright's complaint, embedded in his discussion of the first point of error, that the court
failed to instruct the jury regarding the necessity for corroboration of Evans's testimony, appears
unfounded. Paragraph IV of the instruction explains the corroboration requirement for an
accomplice witness's testimony, declares that Evans was an accomplice to any murder, and
requires the jury to acquit the defendant unless it finds evidence (apart from Evans's testimony)
tending to connect the defendant to the offense charged.
3. The exchange leading to the limiting instruction was as follows:

 Q. And even though in that statement you say that "Kenneth told me that he
was there with 'Rock,' 'T-Top,' 'Tray Man,' and Chris Evans, you're now
telling us he didn't say that? Can you answer that question?

 A. Yes. 

 Q. Did he tell you that or did he not tell you that?

 A. Yeah, he told me that.

 Q. He told you that?

 A. Yeah.

Defense counsel then raised his objection, which was overruled, and requested an instruction
limiting use of that statement to use against Smith, which was given. This exchange occurred long
before the State offered the statement itself into evidence.


.

 By point of error five, Wright contends that the clothing items found at the crime
scene were improperly introduced as evidence because the State failed to prove the chain of
custody. The rules of evidence require authentication or identification that supports a finding that
the matter in question is what its proponent claims. Tex. R. Crim. Evid. 901(a). A chain of
custody is not required if the item possesses characteristics which are fairly distinctive and readily
identifiable, and if the substance of which the item is composed is relatively impervious to change. 
 Ramirez v. State, 658 S.W.2d 808, 812 (Tex. App.--Corpus Christi 1983), aff'd, 672 S.W.2d 480
(Tex. Crim. App. 1984); Hammett v. State, 578 S.W.2d 699, 708 (Tex. Crim. App. 1979)
(citing McCormick's Handbook on the Law of Evidence, 527 (2d ed., E. Cleary ed. 1972)). The
clothing items--a bandana, a sweatshirt, a pair of jeans, a belt, and pair of shoes--are fairly
distinctive and readily identifiable. Robertson, the DPS chemist through whom the items were
admitted, recognized and identified each item as that which he and other searchers found at the
crime scene along with the skeleton. The basic materials of the clothing were essentially
impervious to change (Robertson testified multiple slits were in the shirt when it was found in the
field). There was no evidence or intimation of replacement of or tampering with the clothes. The
State presented sufficient evidence to prove that the items offered in evidence were the items found
at the crime scene. Without evidence of tampering, sparse testimony regarding the chain of
custody of the items in the interim goes to the weight given the evidence. Lagrone v. State, 942
S.W.2d 602, 617 (Tex. Crim. App. 1997) (citing Alvarez v. State, 857 S.W.2d 143, 147 (Tex.
App.--Corpus Christi, 1993, pet. ref'd)). We overrule point five.


 We affirm the judgment.



 


 Marilyn Aboussie, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: July 24, 1997

Do Not Publish

1. Winters and Muhammad appeal their respective convictions in Cause Nos. 03-95-00473-CR
and 03-95-00474-CR also decided this date. We will refer to them and Wright collectively as
"appellants." The three appellants were tried together, and we refer to our other two opinions
for a full recitation of the facts and evidence. 
2. Wright's complaint, embedded in his discussion of the first point of error, that the court
failed to instruct the jury regarding the necessity for corroboration of Evans's testimony, appears
unfounded. Paragraph IV of the instruction explains the corroboration requirement for an
accomplice witness's testimony, declares that Evans was an accomplice to any murder, and
requires the jury to acquit the defendant unless it finds evidence (apart from Evans's testimony)
tending to connect the defendant to the offense charged.
3. The exchange leading to the limiting instruction was as follows:

 Q. And even though in that statement you say that "Kenneth told me that he
was there with 'Rock,' 'T-Top,' 'Tray Man,' and Chris Evans, you're now
telling us he did