Anthony Darnell Conner v. State
















IN THE
TENTH COURT OF APPEALS
 

No. 10-98-097-CR

     ANTHONY DARNELL CONNER,
                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                              Appellee
 

From the 54th District Court
McLennan County, Texas
Trial Court # 97-15-C
                                                                                                                

O P I N I O N
                                                                                                                

      A jury convicted Anthony Darnell Conner of aggravated assault. See Tex. Pen. Code Ann.
§ 22.02(a)(2) (Vernon 1994). The jury assessed Conner’s punishment at nine years’ imprisonment
and a $2,000 fine and recommended that imposition of Conner’s sentence be suspended and that
he be placed on community supervision. In a single issue, Conner challenges the factual
sufficiency of the evidence to support his conviction because of inconsistencies in the victim’s
testimony and because of a lack of corroboration. We will affirm.
BACKGROUND
      The indictment alleges in pertinent part that Conner “intentionally, knowingly and recklessly
threaten[ed] TIMMY HEAD with imminent bodily injury and did then and there use and threaten
with a deadly weapon, to-wit: a handgun.” The State jointly tried Conner and his co-defendant
Reginald Donnell Kennedy for committing the offense. See Tex. Code Crim. Proc. Ann. art.
36.09 (Vernon 1981). The State’s theory of the case at trial was that Kennedy and/or Reginald
Johnson threatened Head with a handgun and that Conner was a party to the offense. The charge
instructed the jury that it could find Conner guilty of aggravated assault if it found that Kennedy
and/or Reginald Johnson threatened Head with a handgun and Conner “acted with intent to
promote or assist the commission of the offense by [Kennedy and/or Johnson] by encouraging,
directing, aiding, or attempting to aid” them in committing the offense. See Tex. Pen. Code
Ann. § 7.02(a)(2) (Vernon 1994).
      Head testified that he got off work at 5:00 p.m. and went to pick up his granddaughter from
her day care center.


 A few blocks before reaching the day care center, he noticed two cars in the
rearview mirror following him. He described the cars as a red Ford Escort and a maroon car. 
He saw “handguns hanging out” of these cars. Head pulled into the parking lot of the day care
center. The red Escort drove a little farther, made a u-turn, and pulled “right up next to” Head’s
car. He identified three occupants in the Escort: Conner was the driver, Johnson was the front-seat passenger, and Kennedy was in the back seat behind Conner.
      Head did not bring his car to a complete stop because Conner pointed a rifle at him and fired
it when Conner pulled up beside him. Head believed the rifle to be a 30-30 due to its size and
what he recalled to be a scope mounted on it.


 Kennedy was pointing a handgun at him at the
same time. Although Head did not recall seeing Kennedy fire the handgun, he described the
encounter thus, “At that particular time, I was—the 30-30 went off. I could hear other shots, but
the 30-30 overwhelmed the smaller guns. But I didn’t—I didn’t stick around to see if they was
firing.” Despite the gunfire, none of the shots hit Head or his car. Head described the rifle shot
as “tremendously loud.” He estimated that he was twenty or thirty feet away from the day care
center entrance when the shots were fired. He agreed that the center was “normally” busy at that
time of day with parents getting off work and coming to pick up their children.
      Head “jumped the curb” and drove home. He called his wife, told her about the incident, and
asked her to get their granddaughter from the day care center. He then called 9-1-1. Waco Police
officer Jeffrey Walters went to Head’s apartment to take his report. Walters talked with Head
about what had happened and prepared a written statement for him to sign. Head characterized
himself as “jittery” and “shook up” when he discussed the matter with Walters.
      Walters received a call that officers had taken custody of suspects possibly involved in the
shooting. He went to the scene and later called Head and asked him to meet near the scene so
Walters could take him to identify the suspects. Head met Walters and then rode in the rear seat
of his patrol car to the scene of the apprehension. Walters illuminated each of the suspects with
a spotlight, and Head promptly identified the suspects (Conner, Kennedy, and Johnson) as the
occupants of the red Escort.
      Head testified that he was convicted of burglary in 1989 and had three misdemeanor theft
convictions from 1988 and 1989. He was paroled in 1991 and has been employed at the same
nursing home ever since.
      On cross-examination by Reginald Kennedy’s counsel, Head identified the front seat passenger
as “Teddy Kennedy.” He reiterated that Reginald Kennedy was in the back seat and had a
handgun. He conceded that perhaps Reginald Johnson was not in the car at all. When counsel
confronted Head with the inconsistencies in his identification of the occupants, he replied, “I know
them by face, but by name, I could have their names misjudged.” On further cross-examination,
Conner’s counsel confronted Head with his written statement in which he stated that there were
four occupants in the Escort.


 Head responded that he had difficulty remembering that far back
and concluded that the statement must be correct.
      Head testified on re-direct that Teddy Kennedy was possibly the fourth occupant in the Escort. 
He made an in-court identification of Reginald Kennedy as having pointed a gun at him and
Conner as having fired a rifle at him, “regardless of [their] name[s].” On re-cross, Head
disavowed his written statement to the extent it suggested he had seen the occupants of the maroon
car pointing guns from the windows or firing guns.
      Officer Walters stated that he was dispatched at approximately 5:00 p.m. on a report of
gunshots having been fired in the 1700 block of West.


 The day care center is located at 16th and
West. After finding nothing amiss in that area, Walters was returning to his regular patrol duties
when he was dispatched at 5:29 to Head’s apartment. He arrived there at 5:39. Walters described
Head as “real shook up, real nervous.” “He was shaking” and appeared frightened. He wrote
Head’s statement for him because he was so shaken. Head gave Walters the names of the
occupants in the Escort before Walters received the dispatch that suspects were in custody. After
writing out the statement, Walters gave it to Head who reviewed it and signed it. Walters
confirmed Head’s recollection of the arrest-scene identification process. According to Walters,
Head had no hesitation in naming or identifying the suspects.
      On cross-examination, Walters testified that he believed he received the first dispatch “right
at five.” On re-direct, he stated that dispatch records show that he received this dispatch at 5:09. 
He agreed on re-cross that the call on which this dispatch was based could have been placed
“several minutes” earlier. He estimated that he was at Head’s apartment between twenty and
twenty-five minutes when he obtained Head’s statement.
      McLennan County Sheriff’s deputies John Kolinek and William Gorham received a dispatch
at 5:36 to the 1600 block of Pine in reference to another shooting incident. This dispatch went
out in response to a call from an off-duty deputy in that area who described the suspect vehicle to
be a red Ford Escort occupied by three black males.


 Kolinek and Gorham went to the scene and
located a red Escort matching the description given. They attempted to stop the Escort, but it fled. 
The Escort stopped a few blocks away, and the occupants fled on foot. Kolinek and Gorham
caught Reginald Kennedy. Another deputy recovered three .38 caliber shells from Reginald
Kennedy’s left coat pocket.
      Waco Police Officer Kermit Graham responded to a dispatch concerning the three suspects
having fled their car. He searched the area for weapons. During the search, he discovered
Conner hiding between hedges and a “wall fence” at a house across the street from where the
suspects had abandoned the car. Deputy Gorham and others pulled Conner from his hiding place. 
Graham found five rounds of .380 caliber ammunition in Conner’s right front pocket.
      Waco officer David Moreno also responded to the dispatch on the fleeing suspects. The
dispatcher informed Moreno that one suspect had possibly entered a residence in that area without
the owner’s permission. Moreno went to that location and found Reginald Johnson laying on a
bed in a rear bedroom. He arrested Johnson and transported him to the scene where the other
officers were gathering. Moreno later found a .38 special in front of the house where Conner was
arrested. A deputy recovered a .380 caliber handgun in front of this house as well.
      Waco officer John Clark collected and tagged all the evidence recovered at the scene. He
personally found a 30-30 rifle and a .380 clip containing three bullets in the abandoned Escort.
      Waco detective Robert Fuller processed the evidence and concluded the investigation of the
case. He testified that no readable fingerprints were found on any of the weapons or ammunition
recovered. During the course of his investigation, he talked with someone at the day care center
who informed him that no one there had seen or heard anything on the evening in question. Fuller
conducted no further investigation in the case. He agreed with Kennedy’s counsel that a 30-30
discharge is quite loud and could be heard from within a building.
      Conner called the day care center’s owner-director La Rue Dorsey to testify. Dorsey
confirmed Head’s testimony regarding the manner in which parents are required to enter the center
and get the children. A parent must ring a doorbell at the side entrance. An assigned employee
then opens the locked door and lets the parent in to get his child. The assigned employee typically
has other duties at the same time they are responsible for answering the doorbell. Thus, the
employee is not always at the door at closing time. “Periodically” however, this employee is
standing outside the door talking with parents as they are departing. Dorsey said the day care is
usually busy between 5:00 and 5:30.
      Dorsey testified that no one in the center heard any gunshots on the evening in question and
no parents reported any unusual happenings. She first discovered that the shooting had occurred
when she read it in the next morning’s paper. She saw no evidence in the following days that the
shooting had happened. Dorsey agreed that she possibly would not have heard gunshots from
inside the building. She also confirmed that a person could enter and drive through the side
parking lot as Head testified he did on the date in question.
      The assistant director of the day care center confirmed much of Dorsey’s testimony. 
However, she characterized the center as “not really” busy during the 5:00 time period. She
suggested that the center was more busy between 4:00 and 5:00.
      Bobbie Horn was the owner of the red Escort involved in the shooting. She testified that the
rear windows of the car are vent windows which push open only a few inches. A person could
not fit his head through this opening. On cross examination, Horn denied telling officer Clark that
Conner had taken her keys. She testified that she did not recall telling Clark that Conner was
driving her car on the date in question. In rebuttal, Clark testified that Horn told him Conner had
taken her keys and was driving the car that evening.
      Reginald Johnson’s brother Terrance testified that Head flagged him down a few months after
the shooting and asked Terrance to follow him to a nearby Burger King because he had to tell
Terrance “something very important.” According to Terrance, Head referred to him as “Reggie”
when they talked. Terrance testified that Head told him he had been trying to contact his mother
or him because he had not pressed any charges and did not want to prosecute. Terrance assumed
Head was talking about the shooting incident with which his brother Reginald, Conner, and
Reginald Kennedy had all been charged. Terrance said Head told him everything happened so
quickly that evening that he “never got a chance to see exactly who it was.” Head told him he had
never had any problems with the “Kennedys.” At that point, Terrance told Head that he was a
“Johnson” and that he must be referring to Reginald Kennedy, not Reginald Johnson. Head
responded, “Well, see, I don’t even know ya’ll.” Terrance testified that Head handed him a
manila envelope from the district attorney’s office and said, “Maybe this right here can help
ya’ll.” Head told him that the district attorney sent him the envelope in an effort to get him to
prosecute the case.
      Terrance testified on cross-examination that he gave the envelope to his mother. He knew his
brother had been indicted for the same shooting incident. The prosecutor suggested that Terrance
was testifying because he did not want to see his brother prosecuted. Terrance denied this and
said, “I just want to see justice done.”
      The court submitted the aggravated assault charge to the jury in Conner’s case on a parties
theory.


 The court also charged the jury on the lesser included offense of deadly conduct based
on Conner pointing the rifle at Head. The jury convicted Conner of the greater offense.
FACTUAL SUFFICIENCY
      Conner argues in his sole issue that the evidence is factually insufficient to support his
conviction because of inconsistencies in Head’s testimony and because of the lack of physical
evidence or other witnesses to corroborate his testimony.
      The Code of Criminal Procedure requires corroboration of only an accomplice’s testimony. 
See Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979). The Code requires the testimony
of at least two witnesses to obtain a conviction only for treason or perjury. Id. arts. 38.15, 38.18
(Vernon 1979). Thus, except in the limited circumstances provided by the Code, the
uncorroborated testimony of a single witness can suffice to support a conviction. See Wipff v.
State, 720 S.W.2d 657, 658-59 (Tex. App.—San Antonio 1986, no pet.).
      When presented with a factual insufficiency claim, we discard the prism of the light most
favorable to the verdict. Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We
reverse "only if [the verdict] is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust." Id. 
      We consider all the evidence in the record related to the contested issue, "not just the evidence
which supports the verdict." Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). 
We review the evidence tending to prove the issue, "and compare[] it to the evidence which tends
to disprove that [issue]." Id. We give appropriate deference to the jury's decision and do not
substitute our judgment for theirs. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 
We do not set aside the "verdict merely because [we] feel that a different result is more
reasonable." Clewis, 922 S.W.2d at 135 (quoting Pool v. Ford Motor Co., 715 S.W.2d 629, 634
(Tex. 1986)); accord Cain, 958 S.W.2d at 407.
APPLICATION
      The record reflects the following evidence which tends to support the jury’s determination that
Conner was a party to the offense:
      •    Head identified Conner as the driver of the red Escort;
 
      •    Head testified that Conner pointed and fired a rifle at him;
 
      •    Head testified that Kennedy pointed a handgun at him from the rear of the Escort;
 
      •    Head testified that he heard other shots fired besides the one coming from Conner’s rifle;
 
      •    Head appeared frightened when Walters took his statement as if he had recently
experienced a traumatic event;
 
      •    Head unequivocally named the occupants of the Escort as his assailants before identifying
them at the scene of their arrest;
 
      •    Someone in the vicinity of the day care center called the police to report gunshots being
fired in the area at the approximate time Head said the incident occurred;
 
      •    Officers found the three suspects named by Head driving a red Escort in the same area
a short time after the incident occurred;
 
      •    The suspects attempted to elude the officers both in the car and on foot;
 
      •    A rifle and two handguns were recovered near the scene of the suspects’ arrest matching
the weapons described by Head;
 
      •    Conner and Kennedy both had ammunition in their pockets matching the calibers of the
recovered handguns; and
 
      •    Horn told Clark that Conner was driving the Escort.

      Other evidence in the record tends to contradict the verdict:
      •    No one at the day care center saw or heard the incident;
 
      •    The day care center is usually busy during that time period, making it less likely that no
one would have seen or heard anything;
 
      •    Head’s written statement is inconsistent with his testimony;
 
      •    Head had difficulty at trial naming the front passenger in the Escort and testified
inconsistently about the identities of the occupants of the car;
 
      •    Head testified that Conner’s rifle had a scope, but the rifle recovered from the Escort did
not;
 
      •    Head’s time sheet from work indicates that he left work at 5:47 on the evening in
question. However, Walters testified that he was with Head at the latter’s apartment at
this time;
 
      •    Some inconsistencies exist concerning Head’s leaving work at 5:00 and having adequate
time to have arrived at the day care center at the time the police received the first report
of gunshots in the area;
 
      •    Head’s credibility may be questioned due to a prior felony conviction and three prior
theft convictions;
 
      •    Kennedy could not have leaned his upper body out of the rear window of the Escort as
Head testified on cross-examination. However, Head was inconsistent on this point. At
one point he testified that only Kennedy’s arm was hanging out with a handgun. Later
he testified that Kennedy himself was “hanging out the window”;
 
      •    The State offered no evidence of Conner’s motive for committing the offense;
 
      •    The State offered no physical evidence (e.g., shells or casings) from the scene to
corroborate Head’s statement because the police did not investigate the area around the
day care center for such evidence;
 
      •    and day care employees saw no evidence that the shooting had occurred.

      Conner’s conviction rests in large part on Head’s credibility. Even if we were to view the
inconsistencies in the evidence in a light most favorable to Conner, we would conclude that they
at best support conflicting inferences concerning Conner’s guilt. Head’s testimony is corroborated
by: his demonstrated fear; the report of gunshots in the area at the approximate time he said the
incident occurred; the fact that the three people Head had previously named were found in a car
matching the description he gave, with weapons also matching his description, and in close
proximity in time and location with the scene of the shooting; and the suspects’ attempt to elude
the officers pursuing them.
      As an appellate court, we must give due deference to the jury’s conclusions regarding the
weight and credibility of the evidence. Cain, 958 S.W.2d at 407; Clewis, 922 S.W.2d at 133. 
After reviewing the entire record, we conclude that the verdict is not “so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.” Cain, 958 S.W.2d at
407; Clewis, 922 S.W.2d at 134. Thus, the evidence is factually sufficient to support Conner’s
conviction. We overrule his sole issue.
      We affirm the judgment.
 
                                                                               REX D. DAVIS
                                                                               Chief Justice


Before Chief Justice Davis
      Justice Vance and
      Justice Gray
Affirmed
Opinion delivered and filed October 13, 1999
Do not publish