TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00867-CV






In the Matter of E. C. S.







FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33RD JUDICIAL DISTRICT


NO. 219, HONORABLE GUILFORD L. JONES, JUDGE PRESIDING







 A jury found that appellant, E.C.S., engaged in the delinquent conduct of
aggravated sexual assault. The court committed him to the Texas Youth Commission until his
twenty-first birthday. E.C.S. challenges both the court's actions in admitting evidence of
extraneous conduct and the legal and factual sufficiency of the evidence to support the jury's
findings. We will affirm.


BACKGROUND


 Undisputedly, sexual contact occurred between the appellant, a fifteen-year-old
male from Cherokee, Texas, and the complainant, a sixteen-year-old female from another town. 
Appellant contends the contact was consensual.

 There is no dispute that the appellant and complainant first met on April 5, 1999. 
The complainant was in town visiting her cousin for Easter. As the two girls drove around
Cherokee, they saw appellant sitting outside his house. He waved and they stopped. He got in
the car, driven by the complainant, and rode to her cousin's house. They played computer games
and talked; appellant tried to get the complainant to smoke, but she declined. Appellant asked for
a ride home, and the complainant offered to drive him home. On the way home, appellant asked
what the complainant intended to do after dropping him off. When she said that her cousin was
going to show her the "major makeout place" in town--a cemetery--he told her that he could show
her the place. It is here that their recollections of events diverge.

 Appellant testified that the complainant stopped the car at the cemetery. He took
a cue from her behavior of stopping at the "major makeout" place and kissed her. He said she
returned the kiss, putting her arms around him. He convinced her to perform oral sex on him,
which she did, briefly, before deciding that she did not want to continue. He asked her what else
she wanted to do; when she did not respond, he kissed her again, and she again returned the kiss. 
As they kissed, he progressed from rubbing her legs to rubbing her "private" to inserting his
fingers into her vagina one at a time. He testified that he asked her if she liked what he was doing
and she said "yes," until he inserted a third finger. When she winced, he told her to relax, but
when she said, "That's enough," he stopped and returned to his side of the car. As the
complainant drove him home, appellant asked if she was okay and she said, "yes." He asked when
she would be back in town and whether she would look for him. She told him she would return
the next week and agreed to look for him. They kissed again and he got out of the car.

 Appellant denied threatening the complainant, grabbing her hair, or forcing her to
do anything; he said he might have put his hand on or around her back during their brief foray into
oral sex. He did not drive the car, did not take the keys, and she did not relinquish the driver's
seat while he was in the car. He testified that he did not know of any rope in the car, did not
know of her interest in the murder of James Byrd by dragging in Jasper, Texas, and did not know
she claimed that he had threatened her with a similar dragging death until he was arrested and
placed in a juvenile detention center.

 He admitted that he had previously been adjudicated delinquent for pinching a girl. 
He said he was released from his probation, though he admitted he did not comply with all the
rules of his probation.

 The complainant's testimony diverges from the appellant's testimony regarding the
circumstances preceding and including their physical contact. She testified that she was uneasy
driving appellant to the cemetery, but she took him anyway because he seemed like a cool person.
She did not expect to be attacked. She testified that turning off the car at the cemetery to talk was
appellant's idea; she says she told him that she wanted to go back to town. His response was to
ask for oral sex, which surprised her. She said they argued about it for ten minutes, during which
time he threatened to drag her behind the car like James Byrd, Jr. had been dragged.(1) She said
he did not show her any rope, but grabbed her arm and used a tone of voice that scared her, made
her cry, and made her fear for her life. She testified that he then grabbed her hair and forced her
to put her mouth on his penis for about thirty seconds, though she did not remember how it
happened or how he got his clothes off. Then, while still holding her hair and her wrist, he told
her to lean her seat back; when she refused, he did it for her. She said he started kissing her and
refused her request that he stop; as he continued, he moved his hand up her leg and penetrated her
vagina with his fingers. She told him it hurt, and he said it would feel better in a little bit. Then
he stopped and asked what she wanted to do. When she again said she wanted to go back into
town, he said, "You don't want to have sex?" When she said "no," he let go of her hair and wrist
and said, "You better not tell anybody." As she drove him to his house, they discussed when she
would return to town.

 She returned to her cousin's house and told her cousin what had happened, then
made the more than two-hour drive home. She said it took a few hours to work up the courage
to tell her mother, who then reported the assault. At the suggestion of San Saba County law
enforcement, the complainant went to a hospital where she was examined by a nurse and given
pain medication to help her sleep. The next day she went to the San Saba courthouse to talk with
authorities about the assault.

 The complainant testified that the appellant was never behind the wheel of her car. 
She denied that she made up the dragging threat. She acknowledged that going to see the "major
makeout place" was her and her cousin's idea, not appellant's idea.

 The complainant's cousin confirmed her role in the events described by the
complainant, but conceded that she had no direct knowledge of what occurred between the
complainant and appellant. The cousin said that, upon returning from taking appellant home, the
complainant went straight to the bathroom, then lay on the cousin's bed for a few minutes. The
complainant seemed very upset--she was pale, slightly disheveled, and quiet. The complainant
said she wanted to talk to her cousin outside; she started crying and told the cousin she had been
attacked. The cousin's retelling of what the complainant told her about the encounter was
essentially the same as the complainant's testimony at trial. The cousin conceded that she had not
put anything in her written statement about the threat of dragging; she thought that the complainant
told her about it over the telephone on the night of the incident. (The complainant testified on
rebuttal that she told her about the threat the first time they talked about it.)

 The complainant's mother testified that her daughter changed at Easter. She
testified that she could tell something was wrong with her daughter when she came home from
visiting the cousin. She encouraged her daughter to talk, but her daughter only got more nervous. 
She asked her daughter to tell her what was wrong regardless of what it was. She testified that
her daughter said she was afraid to say what happened because she feared she would not get to
visit her cousin again and that lawyers would be involved. Only when the mother threatened to
take the car away did her daughter talk with her; the mother later said that she made the threat not
realizing how serious the secret was. Her daughter asked her to come into the bathroom so that
none of the other children would hear. Only then did her daughter tell her about the events of the
day; the mother's testimony about what the complainant told her that night is consistent with the
complainant's testimony at trial, including the threat of dragging behind the car. She did not
believe her daughter made up the story. She said that her daughter's grades declined and her
outlook on life changed after the incident.

 The sexual assault nurse examiner testified regarding her examination of the
complainant. She said that the complainant had a five-centimeter-long tear in the skin along the
right labia minora of her vagina and a one-and-a-half-inch tear near the perineum, both of which
the nurse estimated had been made within the previous day. She said the injuries were consistent
with pulling or pushing with sufficient force to tear the skin, which is consistent with the
complainant's report. She said the complainant's cervix was red and sore; these observations
could indicate infection, but no other signs of infection were present. She said the complainant
reported great tenderness on her mons pubis, but examination revealed no obvious trauma. The
nurse said the complainant's injuries were consistent with forceful digital penetration and that, if
the contact were consensual, it was sadomasochistic; she said that she had not seen teens involved
in sadomasochistic sex. She said she did not think that mere inexperience could explain the
injuries because any consensual activity would have stopped before such painful injuries occurred.


DISCUSSION


 The appellant raises four points of error on appeal. He asserts that the district court
erred by failing to explain certain evidentiary rulings on the record and failing to give a limiting
instruction at the proper time. He also contends the evidence is legally and factually insufficient
to support his adjudication.

 By two points of error, appellant complains about the court's actions and omissions
in admitting evidence of an extraneous bad act. By point three, appellant contends that the district
court erred by failing to provide on the record a complete relevancy analysis in response to his
objection to the State's offer of extraneous conduct evidence. Appellant argues that the district
court's failure to articulate the basis on which it found the evidence admissible also prevented him
from knowledgeably lodging a follow-up objection that the probative value of the offered evidence
was substantially outweighed by the risk of prejudice. By point four, appellant additionally
contends that the court erred by failing to give an appropriate limiting instruction to the jury
regarding that evidence at the time the evidence was admitted.

 Texas Rule of Evidence 404(b) prohibits admission of evidence of other crimes,
wrongs, or acts in order to prove that the accused acted in conformity with the character shown
by those extraneous acts; such evidence may be admissible, however, to prove motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. 
The court of criminal appeals has held that, once a 404(b) objection is made, the proponent of the
evidence must satisfy the trial court that the extraneous bad act has relevance apart from its
tendency to prove character conformity. Montgomery v. State, 810 S.W.2d 372, 387 (Tex. Crim.
App. 1990) (op. on reh'g). Moreover, "[t]he trial court should honor any request by the opponent
of the evidence for articulation into the record of the purpose for which evidence is either offered
by the proponent or ultimately admitted by the trial court." Id. We review the admission of
evidence for an abuse of discretion. Id. at 391; see also Rankin v. State, 974 S.W.2d 707, 718
(Tex. Crim. App. 1996) (op. on reh'g). In its opinion on original submission, the Rankin court
wrote that "[a] court that articulates the relevancy of evidence to an evidentiary fact but does not,
in any way, draw the inference to an elemental fact has not completed the necessary relevancy
inquiry because it has not shown how the evidence makes a 'fact of consequence' in the case more
or less likely." Id. at 710 (original op.).(2)

 At the center of the dispute is evidence that appellant was previously on probation
in Llano County for pinching a girl.(3) The State asserted that it offered the evidence to show
intent, knowledge, motive, and lack of mistake or accident. The appellant rejected those reasons
and requested a "complete relevancy analysis." The court overruled his objection and stated:

 

 It's this Court's opinion under, both under the Montgomery opinions and
[Santellan] which is 939 S.W.2d 155, that this is precisely the type of extraneous
offense or bad act that is admissible and because it does have a strong probative
value as to intent and motive, knowing, action, pattern, preparation, plan, it is not
strictly character conformity but goes directly to the elements in this case.


Appellant's attorney shortly thereafter stated, "As I understand it, the Court is admitting it as proof
of all the eight exceptions in 404(b) or maybe the Court left out one." The district court
responded, "It would be improper for me to specify the matters for which it is admitted because
that would be a comment on the weight of the evidence."

 We find no error in the district court's failure to conduct a more extensive relevancy
analysis on the record. Proof of the offense required proof that the appellant acted intentionally
or knowingly in committing the sexual assaults. The State asserted that it was offering the
evidence to show intent, knowledge, and absence of mistake. In overruling the objection to
evidence of the probation for pinching, the district court listed intent and knowledge among the
factors regarding which the evidence was relevant. Despite the district court's later refusal to get
more specific, we conclude that the court fulfilled its duty by listing aspects of the evidence that
are relevant to elements of the offense. See Montgomery, 810 S.W.2d at 387; see also Rankin,
974 S.W.2d at 710.

 Similarly, we conclude that the district court did not prevent appellant from making
an informed objection under Rule 403. Appellant complains that, because he did not know the
purpose for which the evidence was admitted, he could neither adequately gauge its probative
value nor articulate how that probative value was substantially outweighed by the risk of unfairly
prejudicing, confusing, or misleading the jury. First, we have concluded that the district court
sufficiently identified the relevant purposes for admitting the evidence. Second, even if the
identification was insufficient, that insufficiency did not prevent appellant from presenting a Rule
403 objection. The possible purposes for admissibility are limited and the improper effects of the
evidence are the same regardless of the reason for admission. Appellant could have argued
alternatively on all those bases; appellant's attorneys repeatedly showed themselves capable of
making articulate alternative objections. We overrule point three.

 Appellant further contends that the district court erred by refusing to give an
appropriate limiting instruction to the jury when admitting the extraneous act evidence. After the
evidence was adduced, the court instructed the jury as follows:


 Ladies and Gentlemen, you have heard some evidence of what is known as an
extraneous offense, the prior Llano offense. You are instructed that you may not
consider such evidence merely for showing that the juvenile committed a delinquent
act in the past, that he therefore must have committed a delinquent act on the
current occasion.


The appellant contends that the court should then also have instructed the jury regarding the
purposes for which they could consider the evidence, as it did in the jury charge:(4)


 You are instructed that any evidence before you in this case regarding the Juvenile-Respondent having committed offenses other than the offense alleged against him
in this case, you cannot consider such evidence unless you find and believe beyond
a reasonable doubt that he committed such other offenses, if any were committed;
and even then you may only consider the same in determining the intent,
knowledge, plan, motive, or preparation of the Juvenile-Respondent, if any, in
connection with the offense alleged against him in this case and for no other
purpose.


The appellant contends that this instruction did not solve the problem because, by the time it was
given, the jury "probably had already illicitly used the contested evidence in various ways to shade
their thoughts or weight their conclusions" regarding elements of the case. Appellant's argument
thus depends on a finding that the three hours(5) that passed between the admission of the evidence
and the giving of the more extensive limiting instruction allowed jurors to make harmful and
unwarranted use of the extraneous act evidence.

 We conclude that the district court did not err in its instructions. The district
court's in-trial limiting instruction was sufficient to protect appellant from the proscribed harm.
The rules of evidence forbid the use of extraneous bad acts to prove the character of a person to
show that he acted in conformity with that character in committing the offense. See Tex. R. Evid.
404(b). The in-trial instruction forbade the jury from such use of the evidence of the extraneous
offense, but did not list the allowable uses of the evidence. Appellant contends that this failure
distracted jurors by permitting them to contemplate all sorts of misuses of the evidence. Yet the
in-trial instruction proscribed the one forbidden use--character conformity. The rule does not
exclude other uses. The only potential defect, failure to guide the allowable uses of the evidence,
was cured by the jury charge instruction a few hours later. That instruction did not prejudice the
appellant by dictating the allowable uses of the evidence more tightly than required. Though the
trial court presented its list as exclusive, Rule 404(b) itself presents the uses listed as
examples--extraneous offenses may "be admissible for other purposes, such as proof of motive,
opportunity, . . . ." Id. (Italics added.) The court's instruction limited the jury from the
improper use of the evidence when admitted, and the jury charge instruction limited the allowable
uses more tightly than the rule requires. We conclude that the district court committed no error. 
We overrule point four.

 By his remaining two points of error, appellant contends that the adjudication of
delinquency is not supported by legally or factually sufficient evidence. Adjudications of
delinquency in juvenile cases are based on the criminal standard of proof. See Tex. Fam. Code
Ann. § 54.03(f) (West 1996). Therefore, we review adjudications of delinquency in juvenile cases
by applying the standards applicable to challenges to the sufficiency of the evidence in criminal
cases. See In re E.P., 963 S.W.2d 191, 193 (Tex. App.--Austin 1998, no pet.). In reviewing a
legal sufficiency challenge, we view the evidence in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the elements of the offense beyond
a reasonable doubt. See id. (citing Jackson v. Virginia, 443 U.S. 307 (1979)). When reviewing
the factual sufficiency of the evidence, we view "all the evidence without the prism of 'in the light
most favorable to the prosecution.' . . . [and] set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust." Clewis v. State, 922
S.W.2d 126, 131-132 (Tex. Crim. App. 1996) (citing Stone v. State, 823 S.W.2d 375, 381 (Tex.
App.--Austin 1992, pet. ref'd )); see also In re G.A.T., 16 S.W.3d 818, 828 (Tex. App.--Houston
[14th Dist.] 2000, no pet. h.).

 When reviewing the evidence, we give some deference to determinations made by
the jury. The jury decides the credibility of the witnesses and the weight to be given their
testimony, and it may resolve or reconcile conflicts in the testimony, accepting or rejecting such
portions thereof as it sees fit. Banks v. State, 510 S.W.2d 592, 595 (Tex. Crim. App. 1974). A
jury can accept the State's version of the facts and reject appellant's version or reject any of the
witnesses' testimony. Moore v. State, 804 S.W.2d 165, 166 (Tex. App.--Houston [14th Dist.]
1991, no pet.).

 In order to find that appellant committed aggravated sexual assault, the jury had to
find not only that appellant committed the sexual assault, but that while doing so he, by acts or
words, placed the complainant in fear that death or seriously bodily would be imminently inflicted
upon her. See Tex. Penal Code Ann. § 22.021(a)(2)(A)(ii) (West Supp. 2000). The jury must
decide whether the complainant was fearful, whether the defendant's conduct caused that fear, and
whether the complainant's fear was a reasonable result of the defendant's conduct. Douglas v.
State, 740 S.W.2d 890, 891 (Tex. App.--El Paso 1987, no pet.); Grunsfeld v. State, 813 S.W.2d
158, 162 (Tex. App.--Dallas 1991), aff'd, 843 S.W.2d 521 (Tex. Crim. App. 1992); see also
Kemp v. State, 744 S.W.2d 243, 245 (Tex. App.--Houston [14th Dist.] 1987, pet. ref'd). The
jury may consider an accused's objective conduct, acts, words, or deeds, and infer from the
totality of the circumstances whether his overall conduct placed the complainant in fear of serious
bodily injury. See id. It is not necessary to show that the appellant could have inflicted serious
bodily injury. See Grunsfeld, 813 S.W.2d at 162; see also Lewis v. State, 984 S.W.2d 732, 734
(Tex. App.--Fort Worth 1998, pet. ref'd); Mata v. State, 952 S.W.2d 30, 32 (Tex. App.--San
Antonio 1997, no pet.).

 The dispute on appeal over the sufficiency of the evidence is limited to whether the
appellant caused complainant reasonably to fear imminent serious bodily injury or death; appellant
does not challenge the sufficiency of the evidence regarding the physical elements of the sexual
assault. The disputes are over whether appellant referred to the Jasper dragging murder and, if
so, whether the complainant's fear of imminent death or serious injury was reasonable given the
fact that she was driving the car and knew it did not contain rope.

 This case is similar to the Elkins case in which a Houston court of appeals upheld
a verdict of aggravated sexual assault. See Elkins v. State, 822 S.W.2d 780 (Tex. App.--Houston
[14th Dist.] 1992, pet. ref'd). In that case, the complainant testified that Elkins grabbed her by
her wrist and neck and pulled her into his van. Id. at 783. Elkins took the complainant down a
dark road and she did not know where she was being taken. Elkins told her that if she screamed
or tried to get away, "he'd kill her" and she believed and feared him. Id. She also testified that
he kept his hand on her throat and kept repeating that he would kill her. She said his tone was
harsh and mean. Id. She testified that, when he took her to a trailer, he threw her on the bed,
held her neck and kept telling her not to say anything and then he took off her clothes. He
grabbed her hair to force her to perform oral sex on him. Id. Differences from this case are
obvious. Elkins drove, while the complainant did not. The Elkins assault occurred at night, but
this assault occurred during the day. Elkins apparently kept a grip on his victim the whole time,
made repeated threats, and committed repeated assaults; all these aspects of the assault were much
lesser in this case, including the duration of the physical force, the number of threats, and the
number and duration of the assaults. Duration and repetition, while potentially relevant to the
reasonableness of the complainant's fear, are not necessary elements of the offenses charged here.

 We conclude that legally sufficient evidence supports the jury's findings. Though
appellant denied making the threat, the complainant testified that he did. The jury was entitled to
choose between them. Lending some support to the complainant's testimony is the testimony of
her mother and cousin whom she told about the threat. Viewed in the light most favorable to the
verdict, the uncertainty about when the complainant told them about the threat must be viewed as
uncertainty about the chronology rather than a challenge to the credibility of her testimony. 
Because there is no doubt that being dragged behind an automobile can cause serious bodily injury
or death, the issue remaining is whether the fear of imminent commission of the act was
reasonable. While there may be doubt that the appellant could have carried through with his exact
threat shortly after making it (there was no rope in the complainant's car), the statute does not
require that the State show the appellant could carry out his exact threat. The statute requires only
that the complainant fear serious bodily injury or death. The complainant testified that appellant's
tone as he delivered the threat scared her. She was in an isolated, unfamiliar place. She testified
that the appellant's grip on her hair and wrist was strong enough to force her to perform oral sex. 
As stated, appellant denies that any threats or compulsion occurred. Viewed in the light most
favorable to the verdict, however, the physical location, his apparently superior physical strength,
and his tone provide legally sufficient evidence to support the adjudication.

 Viewed without the prism of the light most favorable to the verdict, the evidence
is factually sufficient to support the verdict. We have reexamined the evidence against the proper
standard and conclude that the jury's findings that, beyond a reasonable doubt, the appellant
committed the acts charged are not so against the overwhelming weight of the evidence as to be
clearly wrong and unjust. We overrule points one and two.


CONCLUSION


 Having overruled all four points of error, we affirm the adjudication of
delinquency.



 

 Jan P. Patterson, Justice


Before Justices Jones, Yeakel and Patterson

Affirmed

Filed: October 26, 2000

Do Not Publish


1. The complainant had written a 22-page research paper for English class about a similar
murder. James Byrd, Jr. was murdered in the East Texas town of Jasper by three men who tied
him to a pickup and drove down a road, dragging Byrd to his death. The murder attracted a great
deal of attention because of its gruesome brutality and the racial animus indicated thereby. The
complainant said her paper discussed the facts of the murder, but focused her feelings about racial
prejudice. She said she did not talk to the appellant about her paper.
2. On rehearing, the court reaffirmed the necessity of this type of review. See Rankin, 974
S.W.2d at 719.
3. The court excluded evidence of other bad acts allegedly committed by appellant.
4. The clerk's record does not contain the jury charge, but the appellant quotes from it in his
brief and has a copy of it in the appendix to his brief, and the State does not challenge the assertion
that this passage was in the jury charge.
5. Contrary to appellant's assertion in the brief that the jury heard the evidence "a day or so"
before receiving the more extensive instruction, the clerk's record indicates that only a few
(approximately four) hours passed. Proceedings began at 9:00 a.m. on September 1, 1999. 
Reporter's Record, Volume 4, p. 1. The evidence came in during appellant's testimony mostly
on pages 62-64 and on pages 75-77. The in-trial limiting instruction is on page 78. The
complainant's cousin testified, then the court recessed for lunch shortly before noon on page 96. 
After trial resumed at 1:00 p.m. (page 97), the complainant and her mother testified in rebuttal,
and the court recessed at 1:20 p.m. (page 112) to finalize the charge. The court estimated the trial
would resume at 1:50 p.m. The charge was read, argument followed, and the jury had a verdict
at 6:47 p.m.


assaults; all these aspects of the assault were much
lesser in this case, including the duration of the physical force, the number of threats, and the
number and duration of the assaults. Duration and repetition, while potentially relevant to the
reasonableness of the complainant's fear, are not necessary elements of the offenses charged here.

 We conclude that legally sufficient evidence supports the jury's findings. Though
appellant denied making the threat, the complainant testified that he did. The jury was entitled to
choose between them. Lending some support to the complainant's testimony is the testimony of
her mother and cousin whom she told about the threat. Viewed in the light most favorable to the
verdict, the uncertainty about when the complainant told them about the threat must be viewed as
uncertainty about the chronology rather than a challenge to the credibility of her testimony. 
Because there is no doubt that being dragged behind an automobile can cause serious bodily injury
or death, the issue remaining is whether the fear of imminent commission of the act was
reasonable. While there may be doubt that the appellant could have carried through with his exact
threat shortly after making it (there was no rope in the complainant's car), the statute does not
require that the State show the appellant could carry out his exact threat. The statute requires only
that the complainant fear serious bodily injury or death. The complainant testified that appellant's
tone as he delivered the threat scared her. She was in an isolated, unfamiliar place. She testified
that the appellant's grip on her hair and wrist was strong enough to force her to perform oral sex. 
As stated, appellant denies that any threats or compulsion occurred. Viewed in the light most
favorable to the verdict, however, the physical location, his apparently superior physical strength,
and his tone provide legally sufficient evidence to support the adjudication.

 Viewed without the prism of the light most favorable to the verdict, the evidence
is factually sufficient to support the verdict. We have reexamined the evidence against the proper
standard and conclude that the jury's findings that, beyond a reasonable doubt, the appellant
committed the acts charged are not so against the overwhelming weight of the evidence as to be
clearly wrong and unjust. We overrule points one and two.


CONCLUSION


 Having overruled all four points of error, we affirm the adjudication of
delinquency.



 

 Jan P. Patterson, Justice


Before Justices Jones, Yeakel and Patterson

Affirmed

Filed: October 26, 2000

Do Not Publish


1. The complainant had written a 22-page research paper for English class about a similar
murder. James Byrd, Jr. was murdered in the East Texas town of Jasper by three men who tied
him to a pickup and drove down a road, dragging Byrd to his death. The murder attracted a great
deal of attention because of its gruesome brutality and the racial animus indicated thereby. The
complainant said her paper discussed the facts of the murder, but focused her feelings about racial
prejudice. She said she did not talk to the appellant about her paper.
2. On rehearing, the court reaffirmed the necessity of this type of review. See Rankin, 974
S.W.2d at 719.
3. The court excluded evidence of other bad acts allegedly committed by appellant.
4. The clerk's record does not contain the jury charge, but the appellant quotes from it in his
brief and has a copy of it in the appendix to his brief, and the State does not challenge the assertion
that this passage was in the jury charge.
5. Contrary to appellant's assertion in the brief that the jury heard the evidence "a day or so"
before receiving the more extensive instruction, the clerk's record indicates that only a few
(approximately four) hours passed. Proceedings began at 9:00 a.m. on September 1, 1999. 
Reporter's Record, Volume 4, p. 1. The evidence came in during appellant's testimony mostly
on pages 62-64 and on pages 75-77. The in-trial limiting instruction is on page 78. The
complainant's cousin testified, then the court re