Criminal Case Template






COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



EDWIN ESCOBEDO,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-04-00215-CR

Appeal from the

262nd District Court

of Harris County, Texas

(TC# 953095)




O P I N I O N

           This is an appeal from a jury conviction for the offense of murder. The jury assessed
punishment at fifty years’ imprisonment in the Institutional Division of the Texas Department
of Criminal Justice. We affirm.
I. SUMMARY OF THE EVIDENCE
           On June 6, 2003, at approximately 7 a.m., while patrolling Houston’s eastside, Officer
T.B. Wallace observed what appeared to be a body as he entered Milby Park. He approached
the body and determined that it was a female. Her eyes were open and she was shaking and
having difficulty breathing. She had a severe head injury. The officer then called for an
ambulance and for backup units to process the scene of what appeared to be a possible
shooting.
           As the investigation continued, the victim was identified as Gerladine Monette
Gonzalez. At one time, she had been a paid informant for the Houston Police Department’s
Narcotics Division, but she had not been used for that purpose in over a year. Several
witnesses were interviewed, and after interviews with two women named Hilda Moreno and
Alejandra Quintanilla, Appellant, and an individual named Andy Galvan, were arrested for
aggravated assault.
           The complainant lived for six weeks in a coma and died on July 12, 2003; she never
regained consciousness. Dr. Harminder S. Narula, an assistant medical examiner for Harris
County, testified that the complainant suffered a perforating gunshot wound to the head and
she suffered a perforating gunshot wound to her left wrist which was defensive in nature. 
The witness testified that the two wounds were the cause of death.
           Hilda Moreno testified that she met the complainant about a month prior to her death. 
She knew her as “Mona.” Moreno admitted to being a prostitute and a crack cocaine addict. 
They became good friends and they often partied together. On those occasions, they would
use alcohol and crack cocaine.
           On the night of June 5, 2003, Moreno stated that she went looking for Mona so that
they could celebrate Moreno’s release from jail after being incarcerated for five days on a
theft charge. Moreno met Mona at an apartment complex where they both smoked some
crack cocaine. Mona had left her baby in the bedroom of an apartment. As people were
smoking crack cocaine near the baby, Mona, Moreno, an individual named Marcus, and the
infant left the complex and walked three blocks to Marcus’ apartment where he stated they
could leave the baby with his girlfriend.
           Mona and Moreno left the apartment and went to a dope house off of La Porte Road,
which was a shack located behind El Ranchito’s Bar, in order to buy some more crack
cocaine. It was about 9:30 p.m. Moreno encountered a friend named Andy Galvan. Mona
obtained some crack cocaine, and she and Moreno went to an apartment to smoke the
cocaine. They returned shortly to the shack, and they met up with Galvan and a heavy set
drug dealer. Appellant was in the area. Moreno did not know Appellant. Galvan’s ex-girlfriend, Alejandra Quintanilla, approached and she got into an argument with Mona over
some money. Moreno told Quintanilla to go back inside the bar because she was pregnant. 
           Mona obtained a ten dollar rock of crack cocaine and she split it up with Moreno. 
Galvan approached them and asked to borrow Mona’s crack pipe. Galvan and Mona went
behind the shack so that Galvan could use the pipe. After several minutes, Moreno went
behind the shack and she saw Mona and Galvan in a black car. Galvan was in the driver’s
seat and Appellant was in the front passenger’s seat. Mona was in the rear seat behind
Appellant. Moreno opened the car door and asked for the pipe. Mona told her to wait; they
were talking. Moreno went back out front of the shack and waited five minutes. She went
back to the car and again opened the car door and asked for the pipe.
           Mona replied that they were leaving and they would be right back. Moreno stated that
she did not want to stay at the shed alone and she was going with them. She got into the back
seat of the car next to Mona and they drove off. They drove to Milby Park and went to the
back area of the park and they parked. Galvan and Mona got out of the car ostensibly to go
to the swing area to smoke some crack; but they stayed by the car. After five minutes,
Galvan got back in the car on the driver’s side. He leaned down and reached for or touched
something in the car and then told Appellant to “take care of his business.”
           Appellant got out of the car and Mona jumped back inside the car. She began
screaming, “Please, please, they’re going to kill me.” Both Galvan and Appellant got out of
the car and went to Mona’s side of the car. They cursed Mona and told her to get out of the
car. Moreno testified that she saw something wrapped around Appellant’s hand; Appellant
then hit Mona in the head. Mona got out of the car and she began backing up while she was
facing Appellant. This continued until they were both out of sight.
           In the interim, Moreno had gotten out of the car. When Mona and Appellant were out
of sight, Galvan grabbed her by the arm and put her into the front seat. They then drove to
the area where they had last seen Appellant and Mona. Galvan turned up the radio. Moreno
heard a “snap” and she saw Appellant getting in the backseat. Appellant leaned over the
center console and said to Galvan, “go, go, go.” Galvan asked Appellant where the gun was
and he replied that he had left it in the park and he then said, “se eso.” Moreno translated
that to mean, “It’s done.” Appellant and Galvan began to argue what they were going to do
with Moreno. On the way back to the El Ranchito Bar, Moreno kept stating they she would
say nothing.
           The three went inside the shack behind the bar. Galvan placed a butterfly knife at
Moreno’s throat, pushed her against the wall, and told her if she said anything, he would kill
her. He then forced her to engage in oral sex and he raped her. Moreno was then left alone
and she crept out the front door of the shack and she went to the north side of Houston where
she felt that nobody knew her. After three days, she called her mother and told her what had
happened. Her mother convinced her to go to the police. Moreno went to the Pasadena
Police Department where she was interviewed. She gave a statement and she took the
interviewing officer to the park where the murder had occurred. She was shown
photographic lineups of both Appellant and Galvan and she identified both as the ones
involved in Mona’s murder. Moreno was in jail at the time she testified. She stated that the
State had not made any deals with her in return for her testimony.
           Alejandra Quintanilla testified that on June 5, 2003, she was seventeen years of age. 
Andy Galvan was her ex-boyfriend. They met in March of 2003 and they lived on the streets
and sustained themselves by drug dealing. The were using crack cocaine and marihuana
dipped in embalming fluid. Quintanilla testified that Appellant and Andy Galvan began
hanging around together in May or June of 2003. She stated that in June, Appellant was
driving a dark green Nissan Altima which at night appeared to be black.
           On June 5, 2003, she was in the back of El Ranchito’s Bar. She knew Mona and
Hilda Moreno because they had smoked crack cocaine together. Mona had the reputation of
being a “snitch.” She saw Mona, Moreno, Appellant, and Galvan behind the bar at the shack. 
She approached Mona and asked for some money that was owed her. A confrontation
ensued and Quintanilla was convinced to go back inside the bar. Later, she looked out the
window of the bar and saw the four of them leaving in Appellant’s car.
           Quintanilla testified that she returned to the shack on June 6 and she saw Appellant
and Galvan. Appellant had a scratch on his face and when she asked how that occurred, he
would not answer, but Galvan stated that a woman named Sandy had scratched Appellant. 
The witness stated that everyone was talking about the shooting that had taken place. 
Quintanilla stated that people were saying that two black men had shot Mona. She went
inside the shack and told Galvan and Appellant about what she had heard; Appellant and
Galvan laughed. She then stated that the person who shot Mona, “didn’t do it right because
she’s in a coma at Ben Taub Hospital.”
           Appellant became upset and asked Quintanilla if she was snitching on him. She stated
she was not, but Appellant came at Quintanilla with a gun in his hand. He threatened her
stating, “I’m going to show you how I give fly, guerra.” She took this to mean that he was
going to show her how he does his thing. Appellant began to make sexual advances and
Galvin intervened. Later, Quintanilla and Galvan returned to the shack with a gun but
Appellant was not there.
           Quintanilla testified that after Mona was shot, Galvan had a large sum of money and
crack cocaine. She was contacted by the police and she cooperated by stating what she knew
of the events surrounding Mona’s shooting. She identified Appellant from a photographic
line-up. Quintanilla was in jail at the time of trial. She testified that she had not made a deal
in return for her testimony.
           During the defense portion of the guilt-innocence stage of trial, Appellant presented
several family members to provide an alibi defense. Appellant’s father testified that on June
5, 2003, Appellant was at home in the evening hours. He stated that Appellant lived in an
apartment with his wife and children behind the father’s house. The father testified that he
saw Appellant on the morning of June 6 at about 7 or 7:30 a.m. A birthday celebration for
Appellant’s uncle was planed that day and Appellant attended the party. The witness stated
that Appellant’s wife owned a dark green Nissan Altima, but she never allowed Appellant
to drive it. The witness admitted that he did not know Appellant’s whereabouts the night of
June 5 to the morning of the 6th.
           Appellant’s mother testified that on June 5, Appellant had dinner with her and the
family. Appellant was at her house until 11 p.m. She then went to Appellant’s apartment
and watched television with his children until 11:30 p.m. She next saw Appellant at 6 a.m.
at her house because Appellant went into her home to use the bathroom as the apartment did
not have a working bathroom. She testified that she did not know Appellant’s whereabouts
from 11 p.m. of the 5th until 6 a.m. of the 6th; although, she speculated that he was asleep. 
           Appellant’s sister stated that on the evening of June 5, she went to the apartment
where Appellant was staying and watched television with her nephews. She stated that she
stayed at the apartment until about 2 a.m., June 6. She went home then because she was
sleepy and she saw Appellant getting ready for bed. She attended her uncle’s birthday party
the next day in the evening. She testified that Appellant’s wife owned a dark green Nissan
Altima that she would not allow Appellant to drive.
           Appellant’s uncle testified that his birthday was celebrated the night of June 6 and
Appellant attended the party. He did not know Appellant’s whereabouts aside from seeing
him on the 4th of June.
II. DISCUSSION
           In Issue No. One, Appellant contends that the evidence is factually insufficient to
support the conviction. Specifically, Appellant asserts that the State’s two main witnesses
who placed Appellant at the drug shack just prior to the murder and at the scene of the
murder were prostitutes and crack cocaine addicts who where both in custody at the time of
the trial. As the Appellant presented evidence from family members that Appellant was at
home when he was supposedly at the murder scene, the evidence is factually insufficient.
           In conducting a factual sufficiency review, we view the evidence in a neutral light to
determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. 
We set aside the fact finder’s verdict only if (1) the evidence supporting the verdict, when
considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) evidence contrary to the verdict is strong enough that the beyond-a-reasonable-doubt
standard could not have been met. Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim.
App. 2004). However, our factual sufficiency review must be appropriately deferential so
as to avoid substituting our judgment for that of the fact finder. Clewis v. State, 922 S.W.2d
126, 133 (Tex. Crim. App. 1996). Accordingly, we are authorized to set aside the jury’s
finding of fact only in instances where it is manifestly unjust, shocks the conscience, or
clearly demonstrates bias. Id. at 135. If the evidence is factually insufficient, we remand to
the trial court for a new trial. Id. at 133-35.
           In the present case, the two witnesses testified with great particularity. Further, we
do not judge the credibility of witnesses in determining factual sufficiency. We must defer
to the jury’s finding that Moreno and Quintanilla were credible witnesses. Santellan v. State,
939 S.W.2d 155, 164-65 (Tex. Crim. App. 1997); Nolasco v. State, 970 S.W.2d 194, 196
(Tex. App.--Dallas 1998, no pet.); Scott v. State, 934 S.W.2d 396, 399 (Tex. App.--Dallas
1996, no pet.). The testimony of the family members did not provide a complete alibi, and
we find that it was not of the nature that it precluded the finding of guilty beyond a
reasonable doubt. Issue No. One is overruled.
           In Issue No. Two, Appellant contends that the State utilized improper jury argument
and the court erred in overruling his objection to that argument. During the prosecutor’s
closing argument at the punishment stage of trial, the following exchange occurred:
STATE:So, what’s the appropriate punishment? Where
do we go from here? Well, Mr. Villarreal says,
give him the low sentence because we can
rehabilitate him. Well, the reality, ladies and
gentlemen, he doesn’t want to be rehabilitated. 
He had that choice also when he was arrested in
March of 2001. Because what was he doing? He
wasn’t going to school. He was selling drugs. 
And Mr. Villarreal can say, he doesn’t have any
convictions for assault, he doesn’t have
convictions for carrying a gun, these are the ones
where he was caught, ladies and gentlemen.
 
DEFENSE:Objection, Your Honor, that’s improper argument.
 
COURT: Overruled.

Later during the same argument, the following occurred:
 
STATE:I want you to think about this: The next time a
body is found in a field, the next time a child goes
missing, the next time someone is raped--
 
DEFENSE:I object to it, Your Honor. It’s an improper plea
for law enforcement.
 
COURT:Overruled.
           With regard to the first argument, Appellant contends that the prosecutor argued
outside the record. He asserts that the second argument was not supported by the record and
was not a proper plea for law enforcement.
           Proper jury argument consists of: (1) summation of the evidence; (2) reasonable
deductions from the evidence; (3) answer to argument of opposing counsel; and (4) a plea
for law enforcement. Alejandro v. State, 493 S.W.2d 230, 231-32 (Tex. Crim. App. 1973);
Laca v. State, 893 S.W.2d 171, 184-85 (Tex. App.--El Paso 1995, pet. ref’d). A prosecuting
attorney is permitted in his argument to draw from the facts in evidence all inferences which
are reasonable, fair, and legitimate, but he may not use the jury argument to get before the
jury, either directly or indirectly, evidence which is outside the record. Borjan v. State, 787
S.W.2d 53, 57 (Tex. Crim. App. 1990) (citing Jordan v. State, 646 S.W.2d 946, 948 (Tex.
Crim. App. 1983)).
           Regarding Appellant’s contention with regard to the first argument, that Appellant’s
counsel made the following argument during his portion of closing argument:
DEFENSE:And if you look at his record, you will notice one
thing. Not one, not one crime of assault,
misdemeanor or felony, not one crime of guns,
not one crime of maybe domestic violence abuse
against your spouse, none of that.

           Further, there was evidence at trial that Appellant utilized a gun during the offense
and he assaulted both the complainant and Alejandra Quintanilla. We find that the
prosecutor’s comment was invited and it did not constitute improper argument.
           Regarding the second argument, we find that it was a proper plea for law enforcement. 
See Cook v. State, 858 S.W.2d 467, 477 (Tex. Crim. App. 1993). Issue No. Two is
overruled.
           Having overruled each of Appellant’s issues on review, we affirm the judgment of the
trial court.
                                                                  RICHARD BARAJAS, Chief Justice

April 27, 2006

Before Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)